STATE OF FLORIDA, OFFICE OF THE ATTORNEY GENERAL, DE-PARTMENT OF LEGAL AFFAIRS, et al., Plaintiffs,

v.

TENET HEALTHCARE CORPORATION,
Defendant.

BOCA RATON COMMUNITY HOSPI-TAL, INC., d/b/a Boca Raton Commu-nity Hospital, on behalf of itself and on behalf of a class of all others simi-larly situated, Plaintiff,

v.

Tenet Healthcare Corporation,
Defendant.

Nos. 05–20591–CIV, 05–80183–CIV.

United States District Court,
S.D. Florida.

Aug. 29, 2005.

Lori S. Rowe, Office of Attorney General, Tallahassee, FL, Christopher M. Kise, Paul Courtney Huck, Jr., Office of the Attorney General, Fort Lauderdale, FL, David A. Coulson, Greenberg Traurig, Miami, FL, David A.P. Brower, Melvyn I. Weiss, Milberg Weiss Bershad Schulman, Ann C. Turetsky, Greenberg Traurig, New York City, Hal M. Hirsch, Richard A. Edlin, Arthur R. Miller, Harvard University, Cambridge, MA, Maya Susan Saxena, Milberg Weiss Bershad Schulman, Boca Raton, FL, Robert P. Charrow, Greenberg Traurig, Washington, DC, Hilarie Bass, for Plaintiffs.

Patrick M. Bryan, Kirkland & Ellis, Washington, DC, Jennifer G. Levy, Susan E. Engel, Nicole B. Pitman, John C. O'Quinn, Karen Natalie Walker, Jay P. Lefkowitz, Brett Alan Barfield, Holland & Knight, Miami, FL, Scott Daniel Ponce, Sanford Lewis Bohrer, Peter Prieto, for Defendant.

### ORDER ON DEFENDANT TENET HEALTHCARE CORPORATION'S MOTIONS TO DISMISS

SEITZ, District Judge.

THIS MATTER is before the Court upon Defendant Tenet Healthcare Corporation's Motions to Dismiss filed in Case No. 05–20591–CIV–SEITZ [DE–29] and Case No. 05–80183–CIV–SEITZ [DE–30]. The Plaintiffs in these two cases—Boca Raton Community Hospital ("Boca"), thirteen public hospitals in Florida ("the Hospital Plaintiffs"),[1] and the Florida Attorney General ("Florida AG")-allege that Tenet purposefully inflated the amount that it charged for hospital services in order to increase Medicare reimbursements that its hospitals received. Specifically, the Plaintiffs[2] contend that Tenet engaged in "turbocharging" to obtain excessive outlier payments on cases that qualified for additional reimbursements under the Medicare program pursuant to a complex formula prescribed by the Secretary of the U.S. Department of Health and Human Services ("HHS").

Defendant Tenet moves to dismiss the Complaints on the grounds that: (1) Medi-

---

1. The thirteen Hospital Plaintiffs in Case No. 05–20591 are: Bert Fish Medical Center, Inc.; Cape Memorial Hospital, Inc.; Halifax Hospital Medical Center; Hendry County Hospital Authority; Holmes County Hospital Corporation; Jackson County Hospital District; Lee Memorial Health System; North Brevard County Hospital District; North Broward Hospital District; Public Health Trust of Miami–Dade County, Florida, Sarasota County Public Hospital District; South Broward Hospital District; and West Orange Healthcare District.

2. The term "Plaintiffs" will be used throughout this Order to refer to all three Plaintiff groups—Boca, the Hospital Plaintiffs, and the Florida AG—collectively.

care preempts the Plaintiffs' state law claims and supercedes their federal RICO claims; (2) Plaintiffs failed to exhaust Medicare's administrative remedies; (3) Plaintiffs lack standing to assert their RICO claims because Tenet's alleged conduct did not proximately cause Plaintiffs' alleged injuries; (4) Plaintiffs have failed to allege facts which, if proven, would constitute a predicate act under RICO; (5) Plaintiffs have failed to adequately allege an enterprise or a conspiracy under RICO; (6) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim must fail because Tenet's alleged conduct was authorized by then-applicable Medicare regulations and the Florida AG has failed to plead this claim with particularity; (7) substantive limits on the scope of state regulatory jurisdiction bar Boca's claim under California's Unfair Competition Law ("UCL"); and (8) the unjust enrichment count fails to state a claim because the Plaintiffs cannot demonstrate that anything was taken from them.

The Court has considered the Motions, the responses and replies thereto, the *amicus* brief of the United States of America, the applicable case law, and the oral argument of counsel at the June 20, 2005, hearing. Having considered the allegations of the Complaints—viewed in the light most favorable to the Plaintiffs—as well as the Medicare regulatory structure, the Court concludes that: (1) Plaintiffs' claims are not preempted under, or superseded by, Medicare; (2) Plaintiffs are not required to pursue the administrative remedies under the Medicare Act; (3) Plaintiffs properly allege RICO standing; (4) Plaintiffs have adequately alleged predicate acts, a RICO enterprise, and proximate cause; (5) Plaintiffs have alleged sufficient facts supporting a RICO conspiracy; (6) the FDUTPA and UCL claims are properly pled and are not subject to dismissal at this stage; and (7) the unjust enrichment claim must be dismissed with prejudice. Accordingly, Tenet's Motions to Dismiss are granted in part, denied in part.

## I. FACTUAL BACKGROUND

This action involves the operation of the Medicare outlier trust fund or pool for inpatient hospital services. Medicare, established in Title XVIII of the Social Security Act ("SSA"), 42 U.S.C. § 1395, *et seq.*, is the federal program that provides health care insurance to the nation's aged and disabled. Compl. of Boca Raton Community Hosp. ("Boca Compl.") ¶ 22; Am. Compl. of State of Fla., Office of Att'y Gen., *et al.* ("Pub.Hosp.Compl.") ¶ 1. Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), a non-independent agency within HHS, and has over 40 million beneficiaries. *Id.*

Because this case addresses the operation of the Medicare outlier trust fund for inpatient hospital services, it is necessary to situate the allegations in the Complaints within the pertinent regulatory and statutory framework governing Medicare reimbursements.

### A. Medicare Regulatory Background and the Outlier Pool

Medicare and its implementing regulations establish an Inpatient Prospective Payment System ("IPPS") under which hospitals are reimbursed for inpatient services provided to Medicare beneficiaries at prospectively fixed rates. Boca Compl. ¶¶ 36–37; Pub. Hosp. Compl. ¶¶ 26–27. Under IPPS, each patient's condition is classified into one of over 520 Diagnosis–Related Groups ("DRG"), to which CMS has assigned a numeric weight reflecting the amount of resources needed, on average, to treat a patient with the corresponding diagnosis. *Id.* Greatly simplified, a hospital's payment for treating a specific

patient is determined by multiplying the numeric weight for that DRG by a standardized amount. *Id.* The standardized amount is based on the average resources used to treat cases in all DRGs, and is adjusted to take into account regional wage rates as well as other factors. *Id.* Hospitals submit their claims for reimbursement to "fiscal intermediaries," usually private insurance companies, to which the Secretary of HHS delegates the day-to-day administration of the Medicare program. *See* 42 U.S.C. § 1395h.

### 1. *The Outlier System*

Although IPPS assumes that fixed payments based on cases of average complexity will provide adequate compensation to efficiently run hospitals, Congress recognized that an extremely costly case could undermine any averaging. Boca Compl. ¶ 43; Pub. Hosp. Compl. ¶ 28. Therefore, in addition to fixed IPPS rates, the Medicare statute also requires that hospitals be reimbursed for atypical medical cases known as "outliers." *Id.* Outlier payments are designed to supplement standard IPPS payments "for extraordinarily high-cost cases."[3] *Id.; see* 42 C.F.R. § 412.84. Under IPPS, a hospital may receive outlier payments when the cost it incurs to treat a patient exceeds the normal IPPS payment by a fixed deductible, the exact magnitude of which is established by a computer program on an annual basis (*i.e.,* the "Outlier Threshold"). Boca Compl. ¶ 44; Pub. Hosp. Compl. ¶ 29. The higher the Outlier Threshold, the fewer the number of cases that qualify as outliers and, for those that qualify, the lower the outlier payments. Boca Compl. ¶ 44; Pub. Hosp. Compl. ¶ 30.

The statute empowers the Secretary to promulgate regulations establishing when outlier payments are appropriate. *See* 42 U.S.C. § 1395ww(d)(5)(A)(iii) ("The amount of such additional payment under clauses (i) and (ii) shall be determined by the Secretary and shall ... approximate the marginal cost of care beyond the cutoff point applicable under clause (i) or (ii)."). The statute also authorizes hospitals to submit claims for outlier payments that satisfy the criteria set forth in the Secretary's outlier regulations. *See* 42 U.S.C. § 1395ww(d)(5)(A)(ii). Exercising this statutory authority, the Secretary decided to tie the outlier payment system to hospital charges—not actual costs. Under the Secretary's formula, although a case qualifies as an outlier if its costs exceed a certain threshold, *i.e.,* "a fixed dollar amount determined by the Secretary," for all cases before October 1, 2003, the hospital's costs were determined based on the hospital's billed charges, adjusted by the hospital's cost-to-charge ratio ("CCR"). 42 U.S.C. § 1395ww(d)(5)(A)(II); 42 C.F.R. § 412.84(h).

Congress constrained the Secretary's discretion in reimbursing outlier cases by setting a five to six percent target for the total amount of outlier payments made each fiscal year in the aggregate to all hospitals, as compared to total aggregate IPPS reimbursements to all hospitals. 42 U.S.C. § 1395ww(d)(5)(A)(iv). For the years at issue in this case, from 1999–2003, the Secretary established a target of 5.1%. *See* 68 Fed.Reg. at 34501. In 2003, the Secretary amended the rules regarding outlier reimbursements, and determined

---

**3.** Specifically, the outlier provision permits hospitals to "request additional payments in any case where charges, adjusted to cost," exceed an amount that the Secretary of HHS specifies. *Id.;* 42 U.S.C. § 1395ww(d)(5)(A)(ii). According to CMS, "[t]his additional payment is designed to pro-tect the hospital from large financial losses due to unusually expensive cases." *Id.;* 68 Fed.Reg. 10420, 10421 (Mar. 5, 2004). The outlier payment is meant to "approximate the marginal cost of care." *Id.;* 42 U.S.C. § 1395ww(d)(5)(A)(iii).

that outlier payments are subject to reconciliation on a case-by-case basis when the cost report relevant to each case is settled. *See* 42 C.F.R. § 412.84(i)(3); 68 Fed.Reg. at 34501. The amended rule thus implements a formula designed to "ensure that when final outlier payments are made, they . . . reflect an accurate assessment of the actual costs the hospital incurred." *Id.* The amended rule did not, however, "make retroactive adjustments to outlier payments to ensure total payments [to all hospitals] are 5.1 percent of [all inpatient spending]," 68 Fed.Reg. at 34502, nor did it restrict a hospital's right to set its own charges or to submit outlier claims for cases that purportedly meet the prescribed criteria.

### 2. *The Cost–to–Charge Ratio*

Each hospital, including the Tenet hospitals, uses what is called a "charge master" that lists charges for each item or service that the hospital provides. Boca Compl. ¶ 45; Pub. Hosp. Compl. ¶ 31. While the outlier system is based on the costs that a hospital incurs to treat a specific Medicare patient, the charges (as reflected on the "charge master") act as a surrogate for a hospital's costs if there is a rational relationship between the hospital's charges and its underlying costs. Boca Compl. ¶ 47; Pub. Hosp. Compl. ¶ 32. To that end, each hospital has a CCR, which is an average that can be used to transform a charge into a cost.[4] *Id.* Outlier payments equal 80% of the difference between the hospital's costs for treating a patient (calculated by adjusting its charges by its CCR), less the sum of the IPPS payment and the Outlier Threshold.[5] Boca Compl. ¶ 48; Pub. Hosp. Compl. ¶ 33.

The outlier system assumes, and CMS issuances require, that a hospital's charges be reasonably and consistently related to its costs of providing the services. *Id.* (citing Prov. Reimb. Man., Part 1, §§ 2202–2203; 42 C.F.R. § 413.53(b)(2)(ii)). As CMS indicated in September 1988, "the use of hospital-specific cost-to-charge ratios is essential to ensure that outlier payments are made only for cases that have extraordinarily high costs, and not merely high charges." Boca Compl. ¶ 49; Pub. Hosp. Compl. ¶ 34; 68 Fed.Reg. at 10423 (Mar. 5, 2003) (citing 53 Fed.Reg. 38476, 38503 (Sept. 30, 1988)).

### B. Tenet's Alleged "Turbocharging"

Tenet is the nation's second-largest for-profit hospital chain. Boca Compl. ¶ 5; Pub. Hosp. Compl. ¶ 24. At all relevant times, Tenet owned or operated approximately 100 hospitals in 13 states, including 15 in Florida. *Id.* Beginning in 1999 and continuing into 2003, Plaintiffs allege, Tenet engaged in a scheme to improperly maximize its outlier payments by artificially inflating its charges. Boca Compl. ¶¶ 50, 75; Pub. Hosp. Compl. ¶¶ 35, 52. By so doing, the Tenet Hospitals transformed ordinary or average-cost IPPS patients into outlier patients, even though the costs that the hospital actually incurred in treating the patients fell within the norm and would not qualify for outlier funds. Boca Compl. ¶ 51; Pub. Hosp. Compl. ¶ 36. By dramatically increasing their billed charges, the Tenet Hospitals represented to CMS that their costs had similarly increased. *Id.* Thus, when the Tenet Hospitals artificially inflated their charges, their "costs"—computed by using CCRs that predated the charge increas-

---

4. For example, if a hospital's CCR is 0.5 and its charges for a patient total $10,000, then its costs to treat that patient would be roughly $5,000. *Id.*

5. The calculation is represented by the following equation: Outlier payment = 80% × [(charges × CCR)—IPPS Payment—Outlier Threshold]. Boca Compl. ¶ 33; Pub. Hosp. Compl. ¶ 48.

es—rose dramatically despite the fact that their real costs remained the same or even declined. Boca Compl. ¶ 52; Pub. Hosp. Compl. ¶ 37.

While the audited CCR should have eventually caught up with the hospitals, that was not the case. Instead, many of the Tenet Hospitals dramatically increased their charges over time to the extent that their CCRs fell precipitously below the range that was considered reasonable under Medicare regulations (*i.e.* three standard deviations from the mean of the log distribution of CCRs for all hospitals) by the next settled cost report. Boca Compl. ¶ 54; Pub. Hosp. Compl. ¶ 39. The fiscal intermediary then assigned a Statewide Average ("SWA") CCR to these hospitals instead of the hospital-specific CCR figure. *Id.* The SWA was considerably higher than the hospital's actual CCR.[6] Boca Compl. ¶ 54; Pub. Hosp. Compl. ¶ 40. Therefore, when the fiscal intermediary applied the higher SWA to compute an individual hospital's outlier payment, it generated excessive outlier payments to Tenet. Boca Compl. ¶ 54; Pub. Hosp. Compl. ¶ 40.

On average, between June 1, 2000, and December 31, 2002, Tenet received outlier payments of over $35 million per month, for a total of $1.1 billion in a period of only 31 months. *Id.* In contrast, if Tenet's outlier payments had been 5.1% of its IPPS payments, Tenet would have received roughly $6 million per month during the same time period. *Id.* Thus, Plaintiffs allege, Tenet's inflation of its charges resulted in Tenet receiving an additional $29 million per month of outlier payments. More than a third of Tenet's hospitals had dramatic increases in their

outlier payments since 2000, with three in particular—Doctors Medical Center (in California), Garfield Medical Center (in California), and Brownsville Medical Center (in Texas)—holding positions in the top 10 of the 200 hospitals nationwide with the greatest increases in outlier payments since 2000. Boca Compl. ¶ 76; Pub. Hosp. Compl. ¶ 56.

### C. The Complaints

The Plaintiffs commenced their respective actions on March 2, 2005. In their First Amended Complaint, filed in Case No. 05–20591–CIV–SEITZ, the Florida AG and the Hospital Plaintiffs assert claims for RICO violations through transporting and receiving stolen or converted money, 18 U.S.C. § 1962(c) (Count I); conspiracy to violate 18 U.S.C. § 1962(c) through transporting and receiving stolen or converted money, in violation of 18 U.S.C. § 1962(d) (Count II); violation of Florida's civil RICO statute, Fla. Stat. §§ 772.103(3) and 772.104 (Count III); conspiracy to violate Fla. Stat. § 772.103(4) (Count IV); violation of the Florida Deceptive and Unfair Trade Practices Act (Count V); and unjust enrichment (Count VI). Boca's Complaint in Case No. 05–80183–CIV–SEITZ alleges claims of RICO violations under 18 U.S.C. § 1962(c) (Count I); conspiracy to violate 18 U.S.C. § 1962(c) (Count II); violation of California's Unfair Competition Law (Count V); and unjust enrichment (Count VII).[7]

### II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that dismissal of a claim is appro-

---

**6.** CMS assigns the SWA to a hospital when its CCR falls below the national threshold because CMS presumes that a CCR below this level is unreasonable and probably due to a faulty data reporting or entry. Boca Compl. ¶ 55; Pub. Hosp. Compl. ¶ 39.

**7.** Boca voluntarily dismissed its fraud-based causes of action, set forth in Counts III, IV, and VI of its Complaint.

priate when "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Ala.*, 30 F.3d 117, 120 (11th Cir.1994). At this stage of the proceedings, the Court must accept the Plaintiff's allegations in the Complaints as true, and view those allegations in a favorable light to determine whether the Complaints state claims for which relief can be granted. *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000). Thus, a court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

However, "[t]o survive a motion to dismiss, plaintiffs must do more than merely state legal conclusions; they are required to allege some specific factual bases for those conclusions or face dismissal of their claims." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263 (11th Cir. 2004). Indeed, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal [for failure to state a claim]." *Davila v. Delta Air Lines*, 326 F.3d 1183, 1185 (11th Cir.2003). Therefore, in considering Tenet's Motions to Dismiss, the Court is "not bound by the legal conclusions in the complaint," and must look instead at the pleaded facts to determine whether the Plaintiffs' claims can proceed through discovery. *Day v. Taylor*, 400 F.3d 1272, 1275 (11th Cir. 2005).

## III. DISCUSSION

### A. Federal Preemption Does Not Bar These Actions

In its Motions to Dismiss, Tenet first argues that the Plaintiffs' Complaints must be dismissed in their entirety because the state law claims are preempted, and the federal RICO claims superceded, by the comprehensive regulatory scheme that Congress adopted through the Medicare program. More specifically, Tenet contends that Plaintiffs may not bring state law claims for what amounts to alleged overpayments to Tenet because the Medicare scheme sets forth both (1) the substantive rules for determining the amount of Medicare reimbursement due to Tenet; and (2) the administrative process by which that amount is finally determined. *See* Def.'s Mem. at 11. Likewise, Tenet argues that the federal RICO claims are superceded by the "comprehensive and reticulated" Medicare scheme. *Id.* at 11–12.

■ "Medicare is a vast and complicated federal program." *Stephenson v. Shalala*, 87 F.3d 350, 351 (9th Cir.1996). In Medicare, Congress has enacted a comprehensive statutory regime and "conferred on the [HHS] Secretary exceptionally broad authority to prescribe standards for carrying out certain sections of the Act." *Id.* at 356 (quoting *Schweiker v. Gray Panthers*, 453 U.S. 34, 43, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981)). Regulatory schemes can displace state law causes of action just as completely as statutes can. *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) ("Federal regulations have no less preemptive effect than federal statutes."); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 295, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). However, the federal Medicare statute can be found to preempt state law causes of action "if and only if Congress intended it to do so." *Mass. Med. Soc'y v. Dukakis*, 815 F.2d 790, 791 (1st Cir.1987).

■ Although Tenet cites nearly two dozen federal preemption cases to the Court, not one of them involves the Medicare Act. In contrast, the four federal

courts of appeals that have addressed the question in the context of the Medicare Act have rejected Tenet's argument, noting, *inter alia,* that Medicare is not a field preempting statute. *Downhour v. Somani,* 85 F.3d 261, 266 (6th Cir.1996); *Med. Soc'y of N.Y. v. Cuomo,* 976 F.2d 812, 820 (2d Cir.1992); *Pa. Med. Soc'y v. Marconis,* 942 F.2d 842, 847 (3d Cir.1991); *Mass. Med. Soc'y,* 815 F.2d at 791.

Only last year, another district court rejected this argument when Tenet itself made it. *See United States v. Tenet Healthcare Corp.,* 343 F.Supp.2d 922 (C.D.Cal.2004). In that case, the federal government filed suit against Tenet under various common law theories, including unjust enrichment. The government alleged that 26 Tenet hospitals had submitted more than 2,400 Medicare claims that were upcoded and that, as a result, CMS paid Tenet more than it was entitled to receive. In denying Tenet's motion to dismiss based on preemption, the Court held that:

> Here, although the government's claim implicates reimbursement determinations, it is not the type of claim that falls within the scope of § 405(h) [of the Medicare Act]. Since the Court is not faced with a claim for reimbursement from a dissatisfied provider that should be channeled through the administrative process, this case does not "arise under" the Medicare Act. Rather, because the government's action is predicated on the submission of inaccurate and misleading claims, the common law, not the Medicare Act, provides both standing and the substantive basis for the claim.

*Tenet,* 343 F.Supp.2d at 928. Upon review of the case law, there is no indication that Congress intended to preempt state law causes of action through the implementation of the Medicare Act. Further, while the Plaintiffs' claims may address reimbursement determinations, at least peripherally, they are not claims that arise under

the Medicare Act. Accordingly, Tenet's motions to dismiss on this basis are denied.

## B. Exhaustion of Medicare Remedies

■ As a parallel argument to their preemption claim, Tenet argues that the Complaints must be dismissed because Plaintiffs failed to allege that they invoked the Medicare regulatory process that Congress established. Tenet correctly argues that the Medicare statute specifically provides a mechanism for the Plaintiffs to seek review of reimbursement determinations, first through an administrative process and ultimately in the courts. *See* 42 U.S.C. § 1395oo; *Regions Hosp. v. Shalala,* 522 U.S. 448, 452–53, 118 S.Ct. 909, 139 L.Ed.2d 895 (1998). However, while Tenet contends that the Plaintiffs' claims set forth in the Complaints are "nothing more than a dressed up complaint about the reimbursements Plaintiffs received from CMS," the characterization of these RICO-based actions as ones for such types of reimbursements is inappropriate. Further, the Eleventh Circuit has clarified that actions against a party other than the HHS Secretary or the federal government are not subject to the exhaustion requirements of the SSA. *See United States ex rel. Body v. Blue Cross/Blue Shield of Ala.,* 156 F.3d 1098, 1104 (11th Cir.1998) ("[a]ctions such as Body's, which do not seek payment from the government and could not be brought under [42 U.S.C.] section 405, are therefore not barred by subsection 405(h)."). Because the Plaintiffs do not seek payment from the Government, but instead seek recovery from Tenet for damages resulting from the alleged "turbocharging" scheme, Tenet's argument with respect to exhaustion of administrative remedies is not persuasive.

## C. Plaintiffs Have Properly Alleged RICO Standing

Tenet also asserts that the Plaintiffs lack standing to make their RICO and Florida RICO claims [8] because Tenet's alleged conduct did not proximately cause Plaintiffs' alleged injury. According to Tenet, the Plaintiffs' alleged harm is far too remote from Tenet's conduct because the independent actions of CMS, its fiscal intermediaries, and other hospitals stand in the middle of the causal chain. *See* Def.'s Mem. at 16–17. Specifically, Tenet asserts that Plaintiffs' causation theory fails because: (1) Tenet hospitals make up only a fraction of the hospitals with low CCRs receiving payments for outliers, and thus, the practices of hospitals other than Tenet's led the Secretary to raise the Outlier Threshold; (2) it is CMS, and not Tenet, that assigns the SWA to a hospital when its CCR falls below the national threshold; and (3) the Secretary, in exercising his sole discretion, elected to raise the Outlier Threshold instead of raising the outlier percentage target. *Id.* at 18. Tenet therefore contends that, even assuming *arguendo* that its alleged actions were wrongful, it did not, as a matter of law, cause the Plaintiffs any direct injury.[9] *Id.* at 19.

In response, the Plaintiffs maintain that their Complaints properly allege "some direct relation between the injury asserted and the injurious conduct alleged," as required under *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Plaintiffs rely significantly on excerpts from the March 11, 2003, testimony of CMS Administrator Thomas A. Scully, before the Senate Appropriations Subcommittee on Labor, Health and Human Services, and Education. In relevant part, Administrator Scully testified that:

> [A]s a direct result [of the excessive outlier payments,] more hospitals have been forced to absorb the costs of the complex cases they treat, while a relatively small number of hospitals that have been aggressively gaming the current rules benefit by getting a hugely disproportionate share of outlier payments. As you can see, the behavior of a few hundred hospitals—those that took advantage of the outlier program— [is] the main cause of the sharp increases in the loss threshold.

Boca Compl. at ¶ 73, Ex. C; Pub. Hosp. Compl. at ¶ 51. Further, Plaintiffs respond to Tenet's reliance on the independent actions of CMS, its fiscal intermediar-

---

**8.** The Florida RICO law was patterned after its federal counterpart. *See Jackson*, 372 F.3d at 1263–64 (quoting *Jones v. Childers*, 18 F.3d 899, 901 (11th Cir.1994) (noting that "interpretation of Florida's RICO law 'is informed by case law interpreting the federal RICO statute . . . on which Chapter 772 is patterned.' ")). The Court therefore applies the same analysis to Plaintiff's federal and state RICO claims. *Id.; see also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir.1998) ("Florida's RICO statutes have consistently been interpreted using federal RICO claim cases.").

**9.** Tenet bases its standing argument on the following characterization of Plaintiffs' alleged causal chain:

> Increasing gross charges gave some Tenet hospitals low CCRs; CMS's fiscal intermediary assigned all hospitals with low CCRs (including some Tenet hospitals) the SWA; using the SWA gave some hospitals (including some Tenet hospitals) higher outlier payments from CMS; higher outlier payments by CMS to these hospitals (only some of which were Tenet hospitals) increased the volume of outlier payments made nationwide; CMS increased the outlier threshold in order to decrease outlier payments nationwide; and this increase by CMS in the outlier threshold potentially deprived plaintiffs of a fraction of outlier payments they might have qualified for had CMS not raised the outlier threshold.
> Def.'s Mem. at 16.

ies, and other hospitals by arguing that: (1) the causal connection is far simpler and less tenuous than Tenet alleges; (2) the mere presence of third parties, such as CMS or other hospitals, does not preclude the Plaintiffs' RICO claims; (3) Tenet cannot evade liability merely because some other hospitals may have engaged in the same form of misconduct; and (4) even if other intermediaries contributed to the alleged injury, expert witnesses will be able to ascertain with reasonable certainty Tenet's direct contribution to the damage, as well as guide the Court in apportioning recoveries to the Hospital Plaintiffs. *See* Pls.'s Mem. at 22–26.

### 1. *Test for RICO Standing*

■ "[T]he test for RICO standing is whether the alleged injury was directly caused by the RICO violation . . . ." *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 908 (11th Cir.1998) (citing *Holmes*, 503 U.S. at 268, 112 S.Ct. 1311); *see also Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (holding that "a plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation" of RICO). Further, a RICO plaintiff must demonstrate that its damages "flow from the commission of the predicate acts." *Williams v. Mohawk Indus., Inc.*, 411 F.3d 1252, 1263 (11th Cir.2005) (citing *Sedima*, 473 U.S. at 497, 105 S.Ct. 3275); *see also Pelletier v. Zweifel*, 921 F.2d 1465, 1497 (11th Cir.1991). "[A] plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover." *Green Leaf Nursery v. E.I. DuPont De Nemours*, 341 F.3d 1292, 1307 (11th Cir. 2003) (citing *Holmes*, 503 U.S. at 268–69, 112 S.Ct. 1311). Therefore, the question before the Court is whether the Plaintiffs' alleged injury to their business or property is sufficiently direct to bestow standing to sue for Tenet's alleged RICO violations.

### 2. *Analysis*

■ According to the Plaintiffs, the injury that they suffered is a direct, proximate, and foreseeable result of the conduct of Tenet and its hospital co-conspirators. Plaintiffs specifically allege that when Tenet, through its alleged RICO enterprise, committed predicate acts of theft and conversion to take hundreds of millions of dollars more a year from the outlier pool than it was entitled to receive, CMS's computer program automatically increased the Outlier Threshold (*i.e.* the deductible applied to the Plaintiffs) in the subsequent year to take into account the large payout to Tenet the previous year. Pls.' Mem. at 23; *see* Boca Compl. at ¶ 65; Pub. Hosp. Compl. at ¶ 44. As a result of the increasing Outlier Threshold, the other hospitals members of the outlier pool (including the Hospital Plaintiffs) received less than that to which they otherwise would have been entitled. Tenet, in the subsequent year, again raised its charges to keep pace with the increase in the Outlier Threshold. These actions, Plaintiffs contend, drove the Outlier Threshold even higher in the next year, and further reduced the amount of outlier payments to the other participating hospitals. *Id.* It is this continuing cycle that the Plaintiffs allege caused them direct injury, as Tenet's alleged intentional inflation of its outlier claims directly reduced the outlier payments to the other participating hospitals.

Upon review of the Plaintiffs' allegations, the Court finds that, for purposes of the Motions to Dismiss, the Plaintiffs have alleged sufficient facts supporting the requisite direct injury. The Hospital Plaintiffs have set forth extensive allegations describing how Tenet's practice of "turboc-

harging" has injured their business or property by driving up the Outlier Threshold and reducing the reimbursements that they were entitled to receive from the outlier pool. These allegations appear to be supported by the statements of Administrator Scully.

Although Tenet contends that the involvement of third parties—such as CMS and other hospitals that contribute to the outlier pool—as potential players in the causal chain that led to the Plaintiffs' injuries precludes a finding of RICO standing, the Court must disagree. First, as to the involvement of CMS, the mere fact that the government may be able to pursue relief against Tenet does not preclude a separate action by the Plaintiffs.[10] *See Rodriguez v. McKinney,* 878 F.Supp. 744, 749 (E.D.Pa.1995) ("Nor is the causal nexus destroyed here merely because DOE [the Department of Education] occupied a spatially intermediate position between defendant and plaintiffs in the flow of the alleged fraud") (citing *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.,* 828 F.Supp. 287, 297 (D.N.J.1993)). Indeed, "[i]f the existence of a public authority that could prosecute a claim against putative RICO defendants meant that the plaintiff is too remote under *Holmes,* then no private cause of action could ever be maintained, for every RICO predicate offense, as well as the RICO enterprise itself, is separately prosecutable by the government." *Commercial Cleaning Serv., LLC v. Colin Serv. Sys. Inc.,* 271 F.3d 374, 385 (2d Cir.2001).

Second, Tenet's contention that the Plaintiffs lack standing because the practices of other non-Tenet hospitals also contributed to the Secretary's decision to raise the Outlier Threshold also fails.

Tenet essentially asks the Court to relieve it of liability because other hospitals may have engaged in the same form of alleged misconduct. However, even if other wrongdoing contributed to the alleged injury, that may not relieve Tenet of responsibility for its own alleged conduct. As this case proceeds through discovery, and if evidence exists to support a finding that Tenet inflated its outlier charges and caused injury to the Plaintiffs, the parties can seek expert testimony to apportion each player's direct contribution to the damage and to ascertain the amount of the injury that each Hospital Plaintiff suffered.

Finally, the mere fact that the Secretary, in exercising his sole discretion, elected to raise the Outlier Threshold instead of raising the outlier percentage target does not preclude a finding of RICO standing. Tenet argues, in essence, that its conduct was too remote because CMS has the discretion to modify the amount contributed to the outlier pool from 5.1% to 6.0%, and that had CMS done that, the Hospital Plaintiffs would not have been injured. Tenet's point here is that it was CMS's intervening decisions—and not Tenet's alleged "turbocharging"—that led to Plaintiffs' alleged injuries. But as Plaintiffs point out, this argument fails because "what CMS might have done is irrelevant since that is not what the Complaints allege that CMS, in fact, did." Pls.' Mem. at 25. Further, the factual allegations in the Complaints indicate that even had the Secretary raised the contribution to 6.0% in response to Tenet's misconduct, rather than raising the Outlier Threshold, the Hospital Plaintiffs still could have been damaged through their need to make higher contributions via withholdings to subsi-

---

10. As Plaintiffs' counsel identified at the oral argument, the damages that the Government may choose to seek from Tenet are different that those that Plaintiffs claim in these actions. Indeed, "the government would be seeking to recover its shortfall and [the Plaintiffs] would be seeking to recover damages as a result of the increased threshold; the increased deductible." *See* Tr. of June 20, 2005, Oral Argument ("Tr."), DE–62 at 26.

dize Tenet's alleged artificially inflated billings (*i.e.,* the hospitals would have been required to make the additional 0.9% contribution).

While it does appear that, for pleading purposes, Plaintiffs have sufficiently alleged a direct injury to meet the requirements of RICO standing, the degree to which other intervening acts contributed to the alleged injury must be explored more fully during discovery and may ultimately form the basis for a subsequent motion for summary judgment. However, given this stage of the litigation, the Court finds that Plaintiffs have sufficiently alleged that Tenet's unlawful conduct had a direct impact on them. *Williams,* 411 F.3d at 1264. Consequently, Plaintiffs have standing to maintain their RICO claims against Tenet.

**D. Plaintiffs Have Stated a Claim Under RICO**

Pursuant to 18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Thus, in order to establish a federal civil RICO violation under § 1962(c), the plaintiffs must satisfy four elements of proof: "(1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity." *Williams,* 411 F.3d at 1256 (citing *Jones v. Childers,* 18 F.3d 899, 910 (11th Cir.1994)). In civil cases, however, RICO plaintiffs must also satisfy the requirements of 18 U.S.C. § 1964(c), which states that "[a]ny person injured in his business or property by reason of" RICO's substantive provisions has the right to "recover threefold the damages he sustains . . . ." 18 U.S.C. § 1964(c). Thus, under § 1964(c), RICO claimants must show (1) the requisite injury to business or property; and (2) that such injury was "by

reason of" the substantive RICO violation. *Williams,* 411 F.3d at 1256.

Tenet challenges Plaintiffs' RICO claims on three grounds. First, Tenet argues that Plaintiffs have not alleged facts sufficient to support a finding that their conduct constituted a predicate act under RICO. Second, Tenet maintains that Plaintiffs failed to properly plead a RICO enterprise. And third, Tenet contends that the allegations do not demonstrate that its alleged racketeering activity caused the Hospital Plaintiffs' injuries. The Court now addresses each of these issues in turn.

*1. Predicate Act*

■ For purposes of the RICO Act, a "pattern of racketeering activity" requires as least two acts of racketeering activity. *Williams,* 411 F.3d at 1256–57 (quoting *Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1397 (11th Cir.1994), *modified on other grounds,* 30 F.3d 1347 (11th Cir. 1994)). An act of racketeering is commonly referred to as a predicate act. A pattern of racketeering activity is shown when a racketeer commits at least two distinct but related predicate acts. *Id.* (quoting *Maiz v. Virani,* 253 F.3d 641, 671 (11th Cir.2001) (internal quotation marks, citations, and brackets omitted)). "If distinct statutory violations are found, the predicate acts will be considered to be distinct irrespective of the circumstances under which they arose." *Cox,* 17 F.3d at 1397 (quotation marks, citations, and emphasis omitted).

Plaintiffs assert that Tenet, by its alleged "turbocharging" practice, stole or converted money from the outlier pool. They maintain, therefore, that their Complaints properly allege a pattern of racketeering activity under sections 2314 and 2315 of the National Stolen Property Act ("NSPA"). Tenet seeks dismissal of the RICO claims on the grounds that the allegations of theft or conversion fail to consti-

tute a predicate act because: (1) Tenet obtained the alleged monies with CMS's consent; and (2) Plaintiffs have no colorable claim of right to the allegedly "stolen" funds.

■ To state a claim under § 2314 of the NSPA, the Hospital Plaintiffs must allege (1) that Tenet transported, transmitted or transferred or caused to be transported, transmitted or transferred in interstate commerce, monies that were stolen or converted; (2) that such monies had a value of $5,000 or more; and (3) that Tenet transported the monies willfully and with knowledge that the monies had been stolen or converted. 18 U.S.C. § 2314; 11th Cir. Pattern Crim. Jury Instr. 78.1 (2003). Further, to allege a § 2315 violation, the Hospital Plaintiffs must show that: (1) Tenet received, possessed, concealed, stored or disposed of stolen money; (2) that such monies had a value in excess of $5,000; (3) that such monies had crossed a State or United States boundary after having been stolen or unlawfully converted; and (4) that Tenet knew that the property had been stolen or unlawfully converted. 18 U.S.C. § 2315; 11th Cir. Pattern Crim. Jury Instr. 79 (2003). As set forth in the Eleventh Circuit Pattern Jury Instructions, "the word 'stolen' includes any wrongful and dishonest taking." 11th Cir. Pattern Crim. Jury Instr. 78.1 (2003); see also United States v. Turley, 352 U.S. 407, 412, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957) ("stealing" has no accepted common law meaning and includes any "felonious taking with ... intent to deprive the owner of the rights and benefits of ownership"); Lyda v. United States, 279 F.2d 461, 464 (5th Cir.1960) [11] (noting that the term "stealing" is "commonly used to denote any dishonest transaction whereby one obtains that which rightfully belongs

to another"). Likewise, "[t]he word 'converted' means the unauthorized exercise of control over the property of another inconsistent with the owner's rights." 11th Cir. Pattern Crim. Jury Instr. 78.1 (2003); see also United States v. Evans, 579 F.2d 360, 361 (5th Cir.1978) (finding trial court did not err in instructing jury that "converted," as used in § 2314, meant "to appropriate dishonestly or illegally to one's own use anything of value").

■ The Complaints allege facts sufficient to satisfy each of the aforementioned required elements. As alleged, Tenet intentionally stole from the Medicare outlier system by grossly inflating its hospitals' charges and engaging in a "systematic, ongoing course of conduct with the goal and intent to steal and/or convert money from the Outlier Pool." Boca Compl. at ¶¶ 49–61, 102; Pub. Hosp. Compl. at ¶¶ 34–61. Additionally, the Complaints allege that:

> [t]he money (i.e. Outlier overpayments) sought and received by the Tenet Hospitals did not belong to them. At no time did Tenet or the Tenet Hospitals have a legitimate ownership or possessory right, entitlement or interest in that money from the Outlier Pool. Thus, Tenet and the Tenet Hospitals' exercise of control over the money was unauthorized and wrongful.

Boca Compl. at ¶ 104; Pub. Hosp. Compl. at ¶ 81. Further, the Complaints allege that Tenet's receipt and exercise of control over payments from the Outlier Pool injured the Hospital Plaintiffs who "were forced to absorb the costs of care for Outlier patients that they would have otherwise been compensated for from the Outlier Pool but for Tenet's improper and illegal acts." Boca Compl. at ¶ 108; Pub. Hosp. Compl. at ¶ 85. The Complaints continue

---

11. In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding prec- edent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

to allege that Tenet transmitted these "stolen" funds in interstate commerce over several years in amounts that exceeded $5,000.00 for most, if not all, of the thousands of predicate acts it committed. Boca Compl. at ¶¶ 104–07, 113–14; Pub. Hosp. Compl. at ¶¶ 81–84, 90–91. The necessary elements for proving violations of the NSPA as predicate acts under RICO have, therefore, been pled.

Tenet argues that the RICO claims based on NSPA violations must fail because CMS "consented" to Tenet's alleged scheme. Tenet relies on case law interpreting the terms "stealing" and "converting" as requiring a showing that the taking was without the owner's consent. *See* Def.'s Mem. at 22–23. As Tenet argues, theft requires a "taking of property without the owner's consent." Black's Law Dictionary 1477 (6th ed.1991); *see also United States v. Turley,* 352 U.S. 407, 413, 77 S.Ct. 397, 1 L.Ed.2d 430 (1957). Likewise, conversion is the "[u]nauthorized and wrongful exercise of the dominion and control over another's personal property." *United States v. McRee,* 7 F.3d 976, 985 n. 2 (11th Cir.1993) (citing Black's Law Dictionary 332 (6th ed.1991)). This argument fails for several reasons. First, there are no allegations in the Complaints that CMS both knew of, and consented to, Tenet's allegedly dishonest scheme. Rather, this argument depends on facts (*i.e.* that CMS had knowledge and gave consent) outside of the four corners of the Complaints, and must be ignored at this juncture. Fed. R.Civ.P. 12(b)(6); *see also Crowell v. Morgan Stanley,* 87 F.Supp.2d 1287, 1290 (S.D.Fla.2000). Second, in *Stewart v. United States,* 151 F.2d 386 (8th Cir.1945), the Court rejected a similar argument and held that "[a]lthough there must be a taking against the will of the owner, or a trespass to his possession, the requirement is satisfied where the owner is induced by some fraud or trickery to deliver the property to one who feloniously converts it to his own use. In such circumstances there is an absence of real consent and the taking of possession is wrongful." *Stewart,* 151 F.2d at 388. Given the allegations that Tenet made submissions to CMS that did not reflect actual costs, in an effort to receive excessive outlier payments to which they were not entitled (but to which the Plaintiffs were allegedly entitled), the Court cannot find that CMS knowingly consented to the allegedly wrongful takings based on the mere fact that CMS disbursed monies to Tenet.[12]

Finally, Tenet contends that the RICO claims must fail because the Hospital Plaintiffs did not allege that they had a colorable claim of right to the stolen outlier funds. In support, Tenet cites to a case holding that "in order for property to be considered 'stolen,' the property must rightly belong to someone other than the person who has it." *United States v. One Lucite Ball Containing Lunar Material,* 252 F.Supp.2d 1367, 1378 (S.D.Fla.2003) (internal quotations omitted). Tenet argues that because the distribution of Medicare reimbursements is "purely a creature of statute and regulation," and Plaintiffs have not demonstrated a specific statutory or regulatory violation, they cannot be held liable for a felonious taking. However, this argument misses the point. The legal standard for claims under the NSPA requires that Plaintiffs allege that the monies that Tenet took did not rightfully belong to Tenet. *See Lyda,* 279 F.2d at

---

12. In so ruling, the Court is not concluding that allegations exist to support a finding of "fraud or trickery." Indeed, Plaintiffs have dismissed their fraud claims, and have agreed to eliminate references to alleged fraud from the Complaints. However, given the allegations, there is support for a finding that CMS did not "consent" to the alleged scheme because Tenet's excessive outlier reimbursements were based on intentionally inaccurate charge submissions to CMS that did not reasonably reflect costs.

464 (stealing "denote[s] any dishonest transaction whereby one person obtains that which rightfully belongs to another."). The Hospital Plaintiffs have properly alleged that Tenet stole and converted monies that did not rightfully belong to it. Boca Compl. at ¶¶ 104–06; Pub. Hosp. Compl. at ¶¶ 81–83. While the Plaintiffs will ultimately have to prove their own interest in the outlier funds, at this juncture, viewing the allegations in the light most favorable to the Plaintiffs, there is at least impliedly (if not explicitly) the allegation that the funds that Plaintiffs seek to recover were funds that would have been theirs. Accordingly, at this stage of the litigation, dismissal of the Complaints for failure to properly allege RICO predicate acts would be inappropriate.

### 2. Enterprise

Next, Tenet asserts that Plaintiffs have failed to properly allege a RICO enterprise. "Essential to any successful RICO claim are the basic requirements of establishing a RICO enterprise." *Jackson*, 372 F.3d at 1264; *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001). "Whatever the pleading requirements for other causes of action, plaintiffs in RICO claims must plead specific facts, not mere conclusory allegations, which establish the enterprise." *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir.1988) (internal quotation omitted).

A RICO enterprise exists "where a group of persons associates, formally or informally, with the purpose of conducting illegal activity." *United States*

v. Hewes, 729 F.2d 1302, 1311 (11th Cir. 1984); *see also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). To allege an enterprise under § 1962(c), the Plaintiffs must "name a RICO person distinct from the RICO enterprise." *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir.2000) ("*Goldin I*"); *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001) (noting that § 1962(c) "require[s] some distinctness between the RICO defendant and the enterprise."). The "plain language of § 1962(c) envisions two separate entities." *Id.* at 1270. Thus, "RICO forbids the imposition of liability where the enterprise is nothing more than a subdivision or part of the person." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1276 (11th Cir.2000) ("*Goldin II*"). Where, as here, the Plaintiffs allege that the enterprise is an association-in-fact, the "crucial factor is whether each entity alleged to be part of the association-in-fact 'is free to act independently and advance its own interests contrary to those' of the other entities." *Lockheed Martin Corp. v. Boeing Co.*, 357 F.Supp.2d 1350, 1365 (M.D.Fla.2005) (quoting *Goldin II*, 219 F.3d at 1277).

Tenet contends that the Complaints do not adequately allege a RICO enterprise because Tenet and the hospital co-conspirators "form a single unit" and are not distinct entities. However, Tenet's argument appears to be rooted in an antitrust and intra-corporate conspiracy doctrine[13] that has been rejected in the RICO context. *See* Def.'s Mem. at 26. In recent

---

**13.** The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. *Kirwin v. Price Commc'ns Corp.*, 391 F.3d 1323, 1326 (11th Cir.2004) (citing *McAndrew v. Lockheed Mar-*

*tin Corp.*, 206 F.3d 1031, 1035 (11th Cir.2000) (en banc)). When applicable, the doctrine precludes a finding of conspiracy because "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Id.; see also Copperweld*

years, both the Supreme Court and the Eleventh Circuit have held that the existence of a legal distinction between the RICO defendant and the RICO enterprise is sufficient to establish an enterprise under RICO. *See Kushner,* 533 U.S. at 165–66, 121 S.Ct. 2087; *see also Kirwin v. Price Commc'ns Corp.,* 391 F.3d 1323, 1327 (11th Cir.2004) (specifically rejecting the intracorporate conspiracy doctrine as a bar to § 1962(d) claims). Therefore, under established and binding precedent, "[c]orporations and their agents are distinct entities" for RICO purposes. *Kirwin,* 391 F.3d at 1327; *see also Kushner,* 533 U.S. at 163, 121 S.Ct. 2087 ("The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.").

■ Here, the Plaintiffs allege that Tenet's RICO enterprise consists of Tenet; a number of hospitals that are wholly-owned, separately incorporated subsidiaries of Tenet; at least one hospital that is part of a joint venture with Tenet; and hospitals leased by subsidiaries of Tenet; and their officers, directors, managers, employees, agents, representatives, and outside consultants. Boca Compl. at ¶¶ 87, 92, 94; Pub. Hosp. Compl. at ¶¶ 25, 66, 71. The allegations of the Complaints are sufficient to indicate that Tenet and the hospitals that allegedly form the Tenet RICO enterprise, as well as its employees and officers, are legally distinct entities that played separate and distinct roles in the enterprise. Boca Compl. at ¶¶ 5, 92, 94, 96–97, 100, 105; *see also* Pub. Hosp.

Compl. at ¶¶ 24–25, 66, 71, 73–74. Therefore, applying *Kushner* and *Kirwin,* the Hospital Plaintiffs have properly alleged a RICO enterprise sufficient to withstand a motion to dismiss.

### 3. *Proximate Cause*

The "by reason of" requirement contained in 18 U.S.C. § 1964(c) implicates two concepts: (1) a sufficiently direct injury so that Plaintiffs have standing to sue; and (2) proximate cause, whereby the allegedly wrongful conduct is shown to be a substantial cause of the alleged injury and the causal connection is foreseeable and not speculative. *Williams,* 411 F.3d at 1260–61 (citations omitted). The Court has already concluded that Plaintiffs' allegations support their standing to sue Tenet. In order for the RICO claims to survive the Motions to Dismiss, the allegations must also support a finding of proximate cause.[14]

■ "It is well-established that RICO plaintiffs must prove proximate causation in order to recover." *Id.* at 1261 (citing *Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1399 (11th Cir.1994)). A proximate cause is not, however, the same thing as sole cause. Instead, a factor is a proximate cause if it is a substantial factor in the sequence of responsible causation. *Id.* Here, even though Tenet argues that other intervening causes destroyed the causal chain between Tenet's actions and Plaintiffs' alleged injuries, Plaintiffs have alleged facts indicating that Tenet's "turbocharging" practice was a substantial factor in the causal chain leading to their injuries. For instance, Plaintiffs allege

*Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (holding, in the antitrust context, that "officers or employees of the same firm do not provide the plurality of actors imperative for a [Sherman Antitrust Act] § 1 conspiracy.").

14. The Eleventh Circuit has recognized the significant overlap between the standing and proximate cause issues. *Williams,* 411 F.3d at 1261 n. 4. Notwithstanding the interconnectedness of the two concepts, the Court reviews the proximate cause issue as a separate, distinct element of a RICO claim.

that as outlier claims skyrocketed, due in significant part to Tenet's overcharging scheme, CMS raised the Outlier Threshold to try to stay within the 5.1 percent target, consequently reducing the frequency and amount of the Plaintiffs' own outlier payments. Boca Compl. ¶ 81; Pub. Hosp. Compl. ¶ 59. Plaintiffs therefore allege that they were damaged by not receiving significant amounts of outlier funds to which they were otherwise entitled. Boca Compl. ¶ 82; Pub. Hosp. Compl. ¶¶ 59–60. Finally, Plaintiffs allege that between June 1, 2000, and December 31, 2002, Tenet hospitals received an additional $29 million per month, on average, in outlier payments, and that more than a third of Tenet's hospitals had dramatic increases in their outlier payments since 2000. Boca Compl. ¶¶ 54, 76; Pub. Hosp. Compl. ¶¶ 40, 56. These allegations, if proven, would suggest that Tenet's alleged misconduct was a substantial link in the causal chain resulting in the Plaintiffs' financial injuries. Thus, for reasons similar to those identified in the standing section, the Court finds that Plaintiffs have sufficiently alleged proximate cause.[15] *Williams*, 411 F.3d at 1262 ("[a]lthough the plaintiffs in this case may not ultimately satisfy the proximate-cause requirement, ... it remains possible that plaintiffs may prove their allegations, and [the Court] cannot say at this Rule 12(b)(6) stage that there is no possibility of such proof.").

#### E. Plaintiffs Have Stated a Claim for RICO Conspiracy

Tenet further challenges the sufficiency of Plaintiffs' allegations as it relates to their RICO conspiracy claims. To establish a RICO conspiracy violation under 18 U.S.C. § 1962(d), the Hospital Plaintiffs must allege "that the defendant objectively manifested, through words or actions, an agreement to participate in the conduct of the affairs of the enterprise through the commission of two or more predicate crimes." *United States v. Starrett*, 55 F.3d 1525, 1543 (11th Cir.1995). "[T]he focus is on the agreement to participate in the enterprise through the pattern of racketeering activity, not on the individual predicate acts." *Id.* at 1544. Although Tenet "must [have] agree[d] to participate in the affairs of the enterprise," *United States v. Valera*, 845 F.2d 923, 929 (11th Cir.1988), the Hospital Plaintiffs may prove Tenet's agreement: "(1) by showing an agreement on an overall objective, or (2) by showing that [Tenet] agreed personally to commit two predicate acts and therefore to participate in a 'single objective' conspiracy." *Starrett*, 55 F.3d at 1544 (citations omitted). Further, "[t]o be guilty of conspiracy ... parties must have agreed to commit an act that is itself illegal—parties cannot be found guilty of conspiring to commit an act that is not itself against the law." *United States v. Vaghela*, 169 F.3d 729, 732 (11th Cir.1999); *see also Jackson*, 372 F.3d at 1269; *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1199 (11th Cir.2004).

In summary, the Hospital Plaintiffs have alleged that Tenet agreed to participate in the conduct of the affairs of the enterprise: (1) when Tenet engaged in a scheme to improperly inflate the outlier

**15.** Tenet's argument regarding the presence of intervening players and acts, addressed in the standing section of this Order, also merits discussion here. As a general matter, the "presence of intervening factors breaks the causal chain between predicate acts and injury, thereby precluding a proximate cause finding." *Andrews v. Am. Nat'l Red Cross, Inc.*, 176 F.Supp.2d 673, 689 (W.D.Tex.2001). However, at this stage of the litigation, the degree of involvement by each alleged actor in the causal chain is unknown, and Tenet has simply failed to demonstrate that it should be absolved of all liability merely because some other actors may have impacted on Plaintiffs' injuries.

charges submitted to CMS; (2) when Tenet and its hospitals directly manipulated the charges submitted to CMS; (3) when "Tenet ... agreed to participate, and participated, in an inflated charging scheme to steal and/or convert money from the Outlier Pool ..."; and (4) when the object of the conspiracy was to illegally obtain excessive reimbursements from CMS. Boca Compl. at ¶¶ 75, 121–22; Pub. Hosp. Compl. at ¶¶ 52, 98–99. As alleged, Tenet and its hospital co-conspirators illegally inflated the claims submitted for outlier payments. Boca Compl. at ¶¶ 49–61, 100(c) & (e); Pub. Hosp. Compl. at ¶¶ 34–41, 77(c) & (e). That agreement to violate the NSPA, if proven, demonstrates the existence of a conspiracy through the conspirators' actions. Thus, the Hospital Plaintiffs have properly pled that Tenet and its hospital co-conspirators were engaged in a conspiracy by alleging that they had an agreement on an overall objective. *Starrett*, 55 F.3d at 1544; *Valera*, 845 F.2d at 929.

Tenet argues that the Plaintiffs have failed to allege facts, as opposed to legal conclusions, sufficient to sustain a finding that an agreement existed. In assessing the sufficiency of the conspiracy claim, the Court can look to whether the defendant's actions "manifested an agreement to participate" in the alleged racketeering activity. *Starrett*, 55 F.3d at 1548. Further, the Eleventh Circuit has recognized that, particularly at the pleading stage, the RICO conspiracy need not be supported by direct evidence, but rather, may be inferred from the parties' conduct. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir.1997). Although the allegations in the Complaints border on being conclusory, given the liberal notice pleadings standard applicable to this claim, the allegations suffice to survive dismissal. Plaintiffs have asserted extensive allegations, as noted above, from which it can be inferred

that Tenet's "turbocharging" scheme was devised as part of a conspiracy. Accordingly, while this issue must be further developed during discovery and may be revisited on summary judgment, the Court cannot grant Tenet's motion to dismiss the conspiracy claim at this time.

### F. Unjust Enrichment

■ Under Florida law, to state a claim for unjust enrichment, the plaintiff must allege that: (1) the plaintiff conferred a benefit on the defendant, who had knowledge of the benefit; (2) the defendant voluntarily accepted and retained the benefit; and (3) under the circumstances, it would be inequitable for the defendant to retain the benefit without paying for it. *Greenberg v. Miami Children's Hosp. Research Inst.*, 264 F.Supp.2d 1064, 1072 (S.D.Fla.2003) (citing *Tooltrend, Inc. v. CMT Utensili SRL*, 198 F.3d 802, 805 (11th Cir.1999)); *see also Duncan v. Kasim, Inc.*, 810 So.2d 968, 971 (2002). Tenet seeks dismissal of this claim on the dual basis that Plaintiffs have failed to demonstrate that they actually conferred any benefit on Tenet, and that the Plaintiffs cannot base an unjust enrichment claim on alleged wrongdoing for which an independent basis for recovery exists.

■ In support of their claim, the Hospital Plaintiffs assert that they conferred a benefit on Tenet "because the reductions in the standardized amount they were to receive under IPPS have been used to pay Tenet for the inflated and improper 'costs' it claimed in connection with the treatment of Outlier patients. Thus the monies received by Tenet from the Outlier Pool far exceeded the true costs of treating the aforesaid Outlier patients." *See* Boca Compl. at ¶ 141. Tenet contends that because the Hospital Plaintiffs have no right, or any colorable claim of title, to the outlier funds, they cannot demonstrate that

they actually conferred any benefit on Tenet or that anything was actually taken away from them. Further, Tenet argues that even if the Court finds that the Hospital Plaintiffs did confer some benefit on Tenet by virtue of their reduced standardized reimbursements, such benefit is far too indirect to maintain an unjust enrichment claim. *See Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1007 (11th Cir.2004) (finding that "at best, [the plaintiff] conferred an indirect or incidental benefit on [the defendant]," which could not support a claim for compensation under the doctrine of unjust enrichment).

The Court need not reach the issue of whether the Hospital Plaintiffs actually conferred a benefit on Tenet, because the allegations of the Complaint, which are premised on Tenet's purported RICO violations and theft of outlier funds, cannot support a claim for unjust enrichment. "Liability in unjust enrichment has in principle nothing to do with fault. It has to do with wealth being in one person's hands when it should be in another person's." *Guyana Tel. & Tel. Co. v. Melbourne Int'l Comms., Ltd.*, 329 F.3d 1241, 1245 n. 3 (11th Cir.2003). Thus, the "paradigm examples of unjust enrichment are mistaken transfers." *Id.* However, as soon as a claimant relies on a wrong to supply the unjust factor, as the Hospital Plaintiffs do here, "the right on which [the plaintiff] relies arises from that wrong, not from unjust enrichment." *Id.* (citation omitted). Here, the Hospital Plaintiffs predicate their unjust enrichment claim on "the wrongful conduct of Tenet" in allegedly submitting "inflated and improper 'costs.'" Boca Compl. at ¶¶ 188, 189; Pub. Hosp. Compl. at ¶¶ 142–43. The Plaintiffs' right of recovery, if any, "arises from the wrong of the [alleged] tort," which, if proven, might entitle them to damages, "rather than unjust enrichment." *Guyana*, 329 F.3d at 1245 n. 3. Because "[t]he law of unjust enrichment is concerned solely with

enrichments that are unjust independently of [alleged] wrongs," Plaintiffs' unjust enrichment claims must be dismissed. *Flint v. ABB, Inc.*, 337 F.3d 1326, 1330 n. 2 (11th Cir.2003) (noting that when the plaintiff relies on a wrong to supply the unjust factor, "the causative event is a wrongful enrichment rather than an unjust enrichment").

### G. Florida Deceptive and Unfair Trade Practices Act

Tenet's challenge to the Florida Attorney General's FDUTPA claim is two-fold. First, Tenet contends that because its alleged conduct was authorized by then-applicable Medicare regulations, it cannot form the basis for a FDUTPA claim. Second, Tenet argues that the FDUTPA claim must fail because it is not pled with particularity in accordance with Fed.R.Civ.P. 9(b). Upon careful review of the allegations in the Pub. Hosp. Compl., both arguments must fail.

The Florida legislature enacted FDUTPA to protect the "consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §§ 501.202(2), 501.204(1) (2005). To state a cause of action under FDUTPA, the complaint must not only plead that the conduct complained of was unfair and deceptive, but also that the complaining party was aggrieved by the alleged act. *Haun v. Don Mealy Imps.*, 285 F.Supp.2d 1297, 1308 (M.D.Fla.2003). A FDUPTA plaintiff, therefore, need only allege facts sufficient to show that it was actually aggrieved by the unfair and deceptive conduct. *Tuckish v. Pompano Motor Co.*, 337 F.Supp.2d 1313, 1320 (S.D.Fla.2004). A court, in determining whether the alleged conduct violates FDUTPA, should

also take into consideration whether the Federal Trade Commission and other federal courts deem such conduct to be an "unfair method of competition or an unconscionable, unfair or deceptive act or practice under federal law." *Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100, 105 (Fla. 1st DCA 1996). Because the legislature did not define what is an unfair or deceptive act, a practice which "offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers may violate [F]DUTPA." *Betts v. Advance Am.*, 213 F.R.D. 466, 482 (M.D.Fla.2003).

 It is well-established that FDUTPA does not apply to any acts or practices that are "required or specifically permitted by federal or state law." *3B TV. Inc. v. State*, 794 So.2d 744, 747 (Fla. 1st DCA 2001) (quoting Fla. Stat. § 501.212(1)); *see also Eirman v. Olde Disc. Corp.*, 697 So.2d 865, 866 (Fla. 4th DCA 1997) (holding that conduct did not violate FDUTPA because it was authorized by then-existing rules of the U.S. Securities & Exchange Commission). However, an act does not need to violate a specific rule or regulation in order to be considered deceptive. *Dep't of Legal Affairs v. Father & Son Moving & Storage, Inc.*, 643 So.2d 22, 24 (Fla. 4th DCA 1994). Therefore, the relevant analysis for this Court is whether Tenet, as the moving party, has demonstrated that a specific federal or state law affirmatively authorized it to engage in the conduct alleged in the Complaints, *not* whether Plaintiffs have demonstrated that Tenet's conduct violates a specific rule or regulation.

 Other than its conclusory assertion that its "alleged conduct was authorized by then-applicable Medicare regulations," *see* Def.'s Mem. at 38, Tenet does not identify any federal statute or regulation that "specifically permitted" it to grossly inflate its charges for outlier pro-

cedures in order to garner outlier payments for average-cost Medicare cases, as alleged in the Complaints. Tenet merely cites to 42 C.F.R. § 412.84 (which provides the regulatory guidelines for outlier payments) and states, with no supporting analysis or factual discussion, that "submitting accurate charges" is specifically permitted. Of course, the Plaintiffs maintain that the charges that Tenet used to maximize its outlier reimbursements were not accurate, in the sense that they did not correlate reasonably to the actual costs of the procedures being performed. *See* Pub. Hosp. Compl. at ¶ 36. Therefore, accepting the Plaintiffs' allegations as true, and viewing those allegations in the light most favorable to the Plaintiffs, Tenet's alleged conduct may form the basis for a FDUTPA claim.

 Likewise, Tenet's insistence that the Florida AG must plead its FDUTPA claim "with particularity" is without merit. Tenet correctly states that Fed.R.Civ.P. 9(b) requires that in all averments of fraud, the circumstances constituting fraud "shall be stated with particularity." However, the Florida AG's FDUPTA claim is not premised on allegations of fraud. FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud, and therefore, "[t]he plaintiff need not prove the elements of fraud to sustain an action under the statute." *Davis v. Powertel, Inc.*, 776 So.2d 971, 974 (Fla. 1st DCA 2000); *see also Office of Attorney Gen., Dept. of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So.2d 592, 598 (Fla. 1st DCA 2004) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at

issue."). Accordingly, the Florida AG's failure to allege facts constituting fraud is not fatal to its FDUTPA claim.[16]

### H. Boca's Claim Under the California Unfair Competition Law

Section 17200 of the California Unfair Competition Law ("UCL") provides a remedy for any injuries resulting from unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. Tenet argues that: (1) Boca, a resident of Florida, cannot assert a claim under the UCL because of the fundamental limits on the scope of state regulatory jurisdiction; (2) Boca has not alleged an unlawful, unfair or fraudulent business practice; and (3) Boca is not entitled to restitution. Upon review of the applicable case law, the Court disagrees.

First, Tenet's argument with respect to the territorial limitations of the UCL overlooks the fact that Boca has alleged unfair conduct occurring in the State of California. Specifically, Boca alleges that Tenet devised, implemented, and directed the scheme that is the subject of the Complaints at its executive headquarters in Santa Barbara, California. *See* Boca Compl. at ¶¶ 5, 170. Boca further alleges that Tenet ultimately received the ill-gotten gains from its outlier overcharge scheme in California. *Id.* at ¶¶ 78–80, 100(g), 105, 107, 112–13, 171. Because

Boca has alleged that it was harmed by wrongful conduct occurring in California, Boca may assert a claim under the UCL.[17] *Diamond Multimedia Sys., Inc. v. Superior Court,* 19 Cal.4th 1036, 1063–64, 80 Cal. Rptr.2d 828, 968 P.2d 539 (Cal.1999) (finding no constitutional impediment in permitting non-Californians a right of action under a domestic statute because California had a "clear and substantial interest in preventing fraudulent practices in this state," or in "extending state-created remedies to out-of-state parties harmed by wrongful conduct occurring in California.") (emphasis in original) (citations omitted).

Second, Tenet incorrectly states that Boca has failed to state a claim under the UCL. Boca's claim is premised on the unlawful and unfair prongs of the UCL.[18] In *Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.,* 178 F.Supp.2d 1099, 1120 (C.D.Cal.2001), the court defined "unlawful acts" under the UCL as business practices that constitute violations of civil or criminal, federal or regulatory law. *Id.* Thus, a claimant may "borrow" a violation of another law that is committed in the course of business activity to support a claim under § 17200. *Id.; see also Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1143, 131 Cal.Rptr.2d 29, 63 P.3d 937 (Cal.2003). An adequately pled RICO violation is sufficient to support a claim under the unlawful prong of Califor-

---

**16.** In a footnote, Tenet also argues that the FDUTPA claim must be dismissed to the extent that the Florida AG seeks recovery for conduct prior to July 1, 2001. *See* Def.'s Mem. at n. 16. However, Tenet has not demonstrated that these pre–2001 claims are subject to dismissal at this time.

**17.** Tenet's reliance on *Norwest Mortgage, Inc. v. Superior Court,* 72 Cal.App.4th 214, 225–26, 85 Cal.Rptr.2d 18 (1999) is misplaced. Tenet relies on *Norwest* for its assertion that Boca's UCL claim must be dismissed. However, in *Norwest,* the Court specifically held that it

was dismissing the UCL claim because the facts demonstrated that the non-Californians were injured by conduct occurring outside of California's borders, by defendants whose headquarters and principal places of operation are outside of California. *Id.* Here, as noted above, Boca has specifically alleged conduct taking place in California, and Tenet's executive headquarters are in Santa Barbara, California.

**18.** Boca is not proceeding on the theory that Tenet's practices were fraudulent. *See* Pls.' Mem. at n. 26.

nia's UCL. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 108 Fed. Appx. 497, 498 (9th Cir.2004). Because the Court previously concluded that Boca's Complaint states a claim under RICO, such allegations suffice to support Tenet's UCL claim. Boca has also adequately alleged unfair business practices. *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999) (finding that unfair conduct is that which "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law or otherwise significantly threatens or harms competition."). Tenet's motion to dismiss Boca's UCL claim is, therefore, denied.

## IV. CONCLUSION

For the reasons discussed above, it is hereby

ORDERED that:

(1) Defendant Tenet Healthcare Corporation's Motions to Dismiss filed in Case No. 05–20591–CIV–SEITZ [DE–29] and Case No. 05–80183 [DE–30] are GRANTED IN PART, DENIED IN PART;

(2) The Motions to Dismiss are GRANTED to the extent that Plaintiffs' unjust enrichment claims, set forth in Count VI in Case No. 05–20591–CIV–SEITZ and Count VII in Case No. 05–80183–CIV–SEITZ, are DISMISSED WITH PREJUDICE;

(3) The Motions to Dismiss are DENIED in all other aspects.