Walter GALSTALDI, et al., Plaintiffs,

v.

SUNVEST COMMUNITIES USA, LLC, a Florida limited liability company; E.W. Sunvest Development, LLC, a Delaware limited liability company; and IMG Academies, LLP, a Florida limited liability partnership, d/b/a IMGA, Defendants.

Case No. 08–62076–CIV.

United States District Court,
S.D. Florida,
Miami Division.

March 25, 2009.

Gail Ann McQuilkin, Harley Shepard Tropin, Kozyak Tropin & Throckmorton, Coral Gables, FL, Chris W. Cantrell, Keith T. Belt, Jr., Belt Law Firm, Birmingham, AL, for Plaintiffs.

Haas A. Hatic, Rebecca Faith Bratter, Richard Wayne Epstein, Greenspoon Marder Hirschfeld Rafkin Ross & Berger, Fort Lauderdale, FL, Gregory J. Trask, Peter W. Homer, Homer & Bonner, P.A., Miami, FL, Andrew M. Genser, Atif Khawaja, Jonathan Putnam, Ryan M. Morettini, Sandra L. Musumeci, Kirkland & Ellis, New York, NY, for Defendants.

## *ORDER*

CECILIA M. ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on a Motion to Dismiss filed by Defendants, Sunvest Communities USA, LLC ("Sunvest"), E.W. Sunvest Development, LLC ("E.W. Sunvest") (collectively "Sunvest"), and IMG Academies, LLP ("IMG") (collectively, "Defendants") [D.E. 12], on January 20, 2009. The Court has carefully considered the parties' written submissions and applicable law.

### I. BACKGROUND [1]

This case arises from an allegedly fraudulent scheme in which Plaintiffs purchased pre-converted condominium units in Orlan-

---

1. The allegations of Plaintiffs' Complaint are taken as true.

do, Florida during 2006 and 2007. (*See* Complaint ("*Compl.*") [D.E. 1, Exhibit 1]). Plaintiffs purchased units at the Eaglewood Apartments from an organization known as Cay Clubs International ("Cay Clubs"). (*See id.* at ¶ 1). Plaintiffs allege they purchased the units based on representations that IMG and Sunvest were partners with Cay Clubs, and the apartment complex would be converted into luxury condominium units, the property developed into a five-star resort, and IMG would develop and manage a sports complex and training facility. (*See id.* at ¶¶ 189, 227).

Plaintiffs were provided promotional materials by agents of Cay Clubs, stressing the partnership between Cay Clubs and IMG. (*See id.* at ¶¶ 190–92). On June 1, 2006, Ricky Stokes ("Stokes"), an agent of Cay Clubs, conducted a promotional "webinar" in which he made the following representations, among others:

● We're going to take this property and turn it into an IMG academy.

● IMG Academies is now joined with us, Cay Clubs in Orlando, and they're moving most of their soccer facilities to the Orlando Cay Club and that is going to be one of the biggest drivers that we're going to have with our property in Orlando.

● [The relationship with IMG] drives people to our property, which decreases the vacancy rate, which increases money in your pocket, which improves our exit strategy and says what we're telling you is true.

● IMG alone is going to represent about 50 percent occupancy in the entire project.

● Because IMG Academies becomes part of the complex, needless to say, the property values for the entire area escalate above normal appreciation values.

(*Id.* at ¶ 190). In another June 1, 2006 webinar, Stokes represented that IMG had agreed to bring all of its soccer training to Orlando, meaning "they have already spoken for—before we've even begun the renovations they've spoken for 60 to 70 percent of the occupancy of this entire project virtually forever." (*Id.* at ¶ 192).

Plaintiffs received marketing materials from Cay Clubs which included the following representation:

> Another *joint venture with* IMG Academies is Orlando Cay Club. In this *joint venture,* IMG Academies will be promoting and managing the sports related side, and Cay Clubs will provide a mix of resort amenities that will accommodate and appeal to large groups of sports teams, friends and family stays.

(*Id.* at ¶ 194) (emphasis in original). Cay Clubs' websites discussed the partnership between Cay Clubs and IMG, including such statements as:

> The city of Orlando is host to some of the greatest attractions Florida has to offer. It is also the home of Cay Clubs [sic] newest project, Orlando Cay Club Resort and Academy. With the cities [sic] high concentration of tourists and Cay Clubs [sic] unique *partnership* with IMG Academies, this project is destined for success. . . .

(*Id.* at ¶ 198) (emphasis in original). IMG also made public statements on its website discussing a partnership with Cay Clubs, stating that:

> Cay Clubs has become IMG Academies' in-house real estate development **partner.** In this capacity, Cay Clubs will enable IMGA to expand its 'community' in terms of programming, accommodations and affiliated sports. In return, IMGA becomes Cay Clubs [sic] internal expert relative to sports straining, education, health and fitness programs, amenities and facilities.

(*Id.* at ¶ 205) (emphasis in original).

IMG promoted the Cay Club Resort and Academy through its real estate office, stating:

An Academy Realty sales agent will provide the utmost professional expertise in not only advertising your unit in the marketing mediums our corporate office has deemed most effective, but, more importantly, in receiving top dollar for the value of your unit within the Orlando Cay Club Resort and Academy.

(*Id.* at ¶ 206). IMG representatives conducted tours of the IMGA Bradenton facility for prospective buyers of units in the Orlando Cay Club Resort and Academy in which IMG spoke directly about its partnership with Cay Clubs and Cay Clubs' designation as its exclusive real estate developer and partner. (*See id.* at ¶ 207).

Cay Clubs represented to Plaintiffs it was partnered with Sunvest through such means as a marketing brochure that stated, "The developer is Sunvest. Their department that does rehab resort projects at the wholesale level is Cay Clubs ... Sunvest is the largest resort developer in the country." (*Id.* at ¶ 216). Due diligence materials also stated, "The cay clubs companies have a ***strategic joint venture*** relationship with Sunvest Resort communities who [sic] is Florida's largest developer of residential and conversations [sic], logging over a billion dollars in annual sales." (*Id.* at ¶ 217) (emphasis in original).

Sunvest represented that it was involved in the project with Cay Clubs and IMG. Sunvest published and distributed a newsletter that addressed its strategic alliance with Cay Clubs and IMG Academies. (*See id.* at ¶ 220). In an SEC filing, Sunvest noted joint venture projects with Cay Clubs. (*See id.* at ¶ 221).

Each Plaintiff entered into a Purchase and Sale Agreement ("PSA")with an entity known as DC720JV, LLC, a subsidiary of Cay Clubs. (*See id.* at ¶ 230). After the execution of the Purchase and Sale Agreements, but prior to closing, Sunvest would sell the units to DC720JV, LLC. (*See id.*). DC720JV, LLC would then sell the units

to individual buyers at prices higher than the prices it had paid to Sunvest. (*See id.*). Sunvest directly participated in the marketing and sale of units through its real estate brokers and agents. (*See id.* at ¶ 222).

Prior to the purchase of the units, Plaintiffs were provided sample appraisals of the units. (*See id.* at ¶ 234). The appraisals were typically $100,000 higher than the purchase prices agreed to by the Plaintiffs. (*See id.*). For example, on October 9, 2006, an appraiser appraised a Plaintiff's unit at $510,000; that Plaintiff purchased the unit for approximately $400,000. (*See id.*). The unit was recently appraised at $90,000. (*See id.*).

Plaintiffs each executed "leaseback" agreements at closing, in which they agreed to lease the property back to Cay Clubs for two years. (*See id.* at ¶ 237). The purpose of the leaseback was to allow Plaintiffs an income stream to maintain the condominiums while Cay Clubs developed the property. (*See id.*). Plaintiffs were to receive the leaseback funds 45 days after closing. (*See id.*). The leaseback funds were not escrowed and were not paid to Plaintiffs, or only minimally paid. (*See id.* at ¶ 238). Many units leased back to Cay Clubs were subleased by Sunvest to third party renters, and Sunvest retained the rent proceeds. (*See id.* at ¶ 239).

The PSAs entered into between Plaintiffs and DC720JV, LLC contained disclaimers concerning earlier representations about the property. (*See id.* at ¶ 242). The Purchase and Sale Agreements contained materially different terms from the oral representations made to the Plaintiffs. (*See id.*). Among the disclaimers and acknowledgments contained in the PSAs are such statements as:

**ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE**

REPRESENTATIONS OF THE DEVELOPER (SELLER). FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT (AGREEMENT) AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.

(PSA, Exhibit A to Declaration of Peter W. Homer [D.E. 12–2], at 1) (bold text in original). Additional material provisions state:

1. *Purchase and Sale.* Buyer agrees to buy and Seller agrees to sell to Buyer (on the terms and conditions set forth below) Unit No. ____ Building ____ (if applicable) (the "Unit") of Orlando Academy Cay Club I, a Condominium (the "*Condominium*"), located in Orange County, Florida (the "County"), Florida, together with those certain fixtures, equipment, and appliances contained in the Unit (the "*Personalty*") and all appurtenances thereto as the same are contained and defined in the Declaration of Condominium for Orlando Academy Cay Club I, a Condominium as recorded or to be recorded in the Public Records of Orange County (as amended from time to time, the "*Declaration*") (the Unit, Personalty and appurtenances are hereinafter referred to collectively as the "*Property*") . . . .

(*Id.* at ¶ 1).

3. *Legally Binding Agreement.* THIS AGREEMENT IS A LEGALLY BINDING CONTRACT. IF NOT FULLY UNDERSTOOD, PLEASE SEEK COMPETENT LEGAL ADVICE. NO WARRANTIES OR REPRESENTATIONS, OTHER THAN THOSE SPECIFIED IN THIS AGREEMENT, ARE EXPRESSED OR IMPLIED. ORAL REPRESENTATIONS CANNOT BE RELIED ON AS CORRECTLY STATING THE REPRESENTATIONS OF SELLER. FOR CORRECT WARRANTIES AND REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT, INCLUDING THE RIDERS AND ADDENDA ATTACHED HERETO, AND THE "*CONDOMINIUM DOCUMENTS*" (AS SUCH TERM IS DESCRIBED IN SECTION 20 HEREIN) PROVIDED TO BUYER.

(*Id.* at ¶ 3).

5. *Deposit.* In the event Buyer's Deposit exceeds ten percent (10%) of the Total Purchase Price, the following provision shall be applicable: Buyer acknowledges, understands, and agrees that (i) Seller may not apply for or obtain all permits necessary to construct the Unit within thirty (30) days from the execution of the Agreement and (ii) Seller may not commence work on the Unit within ninety (90) days of the issuance of such permits, provided however, Seller shall apply for or obtain such permits within one (1) year after the date of the Agreement (the "*Permit Issuance Date*") and Seller shall commence work no later than one (1) year from the Permit Issuance Date. Buyer acknowledges and agrees that the foregoing shall constitute an extension of time limitations set forth in Section 489.126, Florida Statutes.

(*Id.* at ¶ 5).

9. *Completion Date.* It is expressly agreed by Buyer that notwithstanding anything to the contrary specified herein or verbally represented (including, but not limited to Seller's sales representatives), any scheduled completion date is a good faith estimate, and Seller makes no promises or representations concerning the date of completion. Buyer agrees that Buyer has not relied, and

will not rely upon, any estimated completion date for any purpose whatsoever, ...., and Buyer agrees that Seller shall not be liable for any additional costs, expenses or damages whatsoever should the Unit not be completed by an estimated completion date. Notwithstanding the foregoing, Seller is required to complete and does agree that the construction of the Unit shall be completed not later than two (2) years from Buyer's execution of this Agreement. If construction is delayed by events consisting of acts of God, impossibility of performance or frustration of purpose, the date of completion shall be extended by the delay period....

(*Id.* at ¶ 9).

13.6 The acceptance of the Deed by Buyer shall be deemed to be full performance and discharge of every agreement and obligation on the part of Seller to be performed pursuant to this Agreement.

(*Id.* at ¶ 13.6).

15.1 *Existing Improvements and Other Matters.* Buyer understands and agrees that the Condominium is a conversion of a previously existing rental apartment complex which was not constructed by Seller and accordingly that the Condominium is not new construction. Buyer acknowledges having received a copy of the conversion inspection report included in the Prospectus which discloses the condition of various components of the Condominium. Additionally, Buyer has received a copy of a termite inspection report .... These reports disclose, among other things, a discussion on the current condition of the Condominium and many of its mechanical and structural components. Because the Unit and Condominium are substantially complete as of the date Buyer signs this Purchase Agreement, Buyer acknowledges and agrees that,

subject to the Provisions of this Section, Buyer has inspected the Unit and the Condominium and had the opportunity to examine such plans and specifications as Seller has obtained (including all changes thereto to date) for the Unit and Condominium ... and by signing this Purchase Agreement, Buyer agrees to accept the Unit and the Condominium in their "AS IS—WHERE IS" condition, subject to Section 718.618 of the Florida Statutes.

(*Id.* at ¶ 15. 1).

25.4 Buyer acknowledges that Seller has made no representations or warranties regarding (i) the economic advantages or disadvantages of purchasing the Unit, (ii) any potential increase in the value of the Unit above the Purchase Price, or (iii) the purchase of the Unit as an investment or for other economic purposes, and Buyer has and will rely on its own determination of such matters in purchasing the Unit.

(*Id.* at ¶ 25.4).

25.5 Buyer agrees that no warranties, express or implied, representations, understandings, guarantees or promises have been made to or relied upon by Buyer in making the determination to execute this agreement.

(*Id.* at ¶ 25.5).

38. *Entire Agreement.* BUYER CERTIFIES THAT BUYER HAS READ EVERY PROVISION OF THIS AGREEMENT, WHICH INCLUDES EACH RIDER AND ADDENDUM ATTACHED HERETO AND THAT THIS AGREEMENT, TOGETHER WITH EACH SUCH RIDER AND ADDENDUM, CONSTITUTES THE ENTIRE AGREEMENT BETWEEN BUYER AND SELLER. PRIOR AGREEMENTS, REPRESENTATIONS, UNDERSTANDINGS, AND ORAL STATEMENTS NOT RE-

FLECTED IN THIS AGREEMENT HAVE NO EFFECT AND ARE NOT BINDING ON SELLER. BUYER ACKNOWLEDGES THAT BUYER HAS NOT RELIED ON ANY REPRESENTATIONS, NEWSPAPERS, RADIO OR TELEVISION ADVERTISEMENTS, WARRANTIES, STATEMENTS, OR ESTIMATES OF ANY NATURE WHATSOEVER, WHETHER WRITTEN OR ORAL, MADE BY SELLER, SALES PERSONS, AGENTS, OFFICERS, EMPLOYEES, COOPERATING BROKERS (IF ANY) OR OTHERWISE EXCEPT AS HEREIN SPECIFICALLY REPRESENTED. BUYER HAS BASED HIS/HER/THEIR DECISION TO PURCHASE THE PROPERTY ON PERSONAL INVESTIGATION, OBSERVATION AND THE DOCUMENTS.

(*Id.* at ¶ 38).

41. *Inducement.* Buyer acknowledges that the sole inducement to close on the purchase of the Property is the Property itself and not (1) the common facilities comprising part of the Condominium, if any, or (2) any expectation that the Property will increase in value.

(*Id.* at ¶ 41).

No development of any kind nor any condominium conversions ever took place at the Eaglewood Apartments. (*See Compl.* at ¶ 243). Plaintiffs paid more than $70 million in purchase money and thousands in membership fees, and none of these monies were ever returned to Plaintiffs. (*See id.*). Plaintiffs allege the properties they purchased are essentially worthless, located in a "low-end abandoned moldy bug and rodent infested apartment complex." (*Id.*)

Plaintiffs filed suit against Sunvest and IMG, asserting the following counts: (1) Count One for declaratory relief under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA"), Fla. Stat. § 501.201 *et. seq.*; (2) Counts Two and Three for violations of the FDUTPA;[2] (3) Count Four for fraudulent inducement; and (4) Count Five for conversion and civil theft. Defendants move to dismiss all counts of Plaintiffs' Complaint.

## II. LEGAL STANDARD

A motion to dismiss a complaint for failure to state a claim requires that a court accept the facts pleaded as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.,* 711 F.2d 989, 994–95 (11th Cir.1983). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests ....'" *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Nevertheless, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do ...." *Id.* at

---

**2.** Count 2 alleges Defendants directly, and indirectly through Cay Clubs, engaged in deceptive and unfair trade practices by making statements that Eaglewood Apartments would be converted into a luxury resort. In Count

3, Plaintiffs allege Defendants engaged in deceptive and unfair trade practices by holding themselves out as Cay Clubs' partner and co-developer.

1964–65, 127 S.Ct. 1955 (citations omitted). "[A] complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir.2008) (quoting *Twombly*, 127 S.Ct. at 1965). "When the allegations contained in a complaint are wholly conclusory ... and fail to set forth facts which, if proved, would warrant the relief sought, it is proper to dismiss for failure to state a claim." *Davidson v. Georgia*, 622 F.2d 895, 897 (5th Cir.1980) (citations omitted).

The analysis of a 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto. *Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1368–69 (11th Cir.1997). However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of a Rule 12(b)(6) dismissal, and having such documents attached to the motion to dismiss will not require conversion of the motion into a motion for summary judgment. (*Id.*). Furthermore, the Court may take judicial notice of public records, in this instance documents filed in a state court lawsuit between the parties, without converting the motion to dismiss to a summary judgment motion. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir.1999) (court may consider public SEC records at motion to dismiss stage without requiring automatic conversion to the summary judgment stage).

## III. ANALYSIS

Defendants assert that all of Plaintiffs' claims must fail, for various reasons. Each argument is addressed in turn.

## A. The FDUTPA

Defendants challenge Plaintiffs' FDUTPA claims stated in Counts One, Two and Three. Four principal reasons are advanced: (1) the written contracts bar Plaintiffs from asserting FDUTPA claims; (2) Plaintiffs have failed to plead Defendants' direct involvement in the unfair trade practices complained about; (3) Plaintiffs do not have standing to seek declaratory relief; and (4) Plaintiffs have failed to plead the FDUTPA counts with the requisite particularity. These arguments fail to persuade.

### 1. The Written Contracts Do Not Bar Plaintiffs' FDUTPA Claims

Defendants assert "[i]t is well-settled under Florida law that a plaintiff's reliance on a defendant's alleged prior misrepresentations that contradict the express terms of the ensuing written agreement is unreasonable as a matter of law, and bars recovery under both the FDUTPA and claims of fraudulent inducement." (Defendants' Motion to Dismiss ("*Mot. Dismiss*") [D.E. 12] at 6). Defendants assert the various disclaimers found in the PSAs mandate that Plaintiffs' FDUTPA claims be dismissed.

In support of this assertion, Defendants cite several cases in which district courts in the State of Florida, applying Florida law, have dismissed FDUTPA and fraudulent inducement claims based on disclaimer language and integration clauses in contracts between the parties. *See Century Land Dev., L.P. v. FFL Dev., L.L.C.*, No. 07–14377, 2008 WL 1850753 (S.D.Fla. Apr. 24, 2008); *Garcia v. Santa Maria Resort, Inc.*, 528 F.Supp.2d 1283 (S.D.Fla.2007); *Zlotnick v. Premier Sales Group, Inc.*, 431 F.Supp.2d 1290 (S.D.Fla.2006). The cases cited by Defendants involved defendants who were parties to contracts that contradicted prior representations, and are therefore distinguishable from the facts alleged here. In this case, Defendants are not alleged to be parties to any contracts with Plaintiffs.

■ As the Eleventh Circuit has noted, there is a "general rule that a non-party to a contract may not invoke the contract." *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 973 (11th Cir.2002). Numerous courts have held the same. *See, e.g., Output, Inc. v. Danka Business Systems, Inc.*, 991 So.2d 941, 944–945 (Fla. 4th DCA 2008) (non-party to contract cannot take advantage of exculpatory clauses in contract); *In re WorldCom, Inc.*, 374 B.R. 94, 108–109 (Bankr.S.D.N.Y.2007) (non-party cannot rely on integration clause); *Interwave Technology, Inc. v. Rockwell Automation, Inc.*, No. Civ. A. 05–0398, 2006 WL 401843, at *4, n. 4 (E.D.Pa. Feb. 16, 2006) ("an integration clause 'does not, however, bar those claims against [a defendant] which was not a party to the [contract].'") (quoting *Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 656 (W.D.Pa.1999)); *Elzinga & Volkers, Inc. v. LSSC Corp.*, 838 F.Supp. 1306, 1313 (N.D.Ind.1993) ("as is" clause does not inure to the benefit of contractor who is not a party to the contract).

■ Defendants have expressly disavowed any connection to the Purchase and Sale Agreements entered into by Plaintiffs and DC720JV, LLC. In March, 2008, IMG and Sunvest moved the state court in Orange County, Florida, to stop arbitration proceedings Plaintiffs had initiated against them. (*See* Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("*Plaintiffs' Response*"), Exhibit A [D.E. 38–2]). The

arbitration proceedings brought by Plaintiffs were based upon an arbitration clause contained in the PSAs. In its Application to Stay Arbitration Proceeding, IMG stated "IMGA is not a party to any contracts with Respondents, let alone any contracts with them that contain any arbitration provisions." (*Id.* at 2). Similarly, Sunvest stated it "is neither a party to the purchase and sale agreement ... nor to any purchase and sale agreement with Defendants." (*Id.* at 13).

■ "A non-signatory to a contract cannot invoke the benefits of a contract and, at the same time, disavow portions that impose an obligation." *Doeff v. Transatlantic Reinsurance Co.*, No. 07–2110, 2007 WL 4373041, at *4 (E.D.Pa. Dec. 13, 2007) (citations omitted). "The doctrine of equitable estoppel prevents a [party] from asserting that the contract's arbitration clause does not bind him because he did not sign the contract while simultaneously seeking to enforce those provisions that benefit him." *Id.* (citation omitted); *see also Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir.2000) ("In the arbitration context, ... a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.").[3]

---

**3.** In their Reply Memorandum, Defendants acknowledge Plaintiffs originally attempted to invoke the arbitration clause against Defendants to compel them to arbitrate the claims. (*See* Defendants' Reply Memorandum ("*Reply*") [D.E. 44] at 2–3). While Defendants successfully resisted that attempt, they now contend, "[h]aving sought to enforce the contracts against Defendants, Plaintiffs cannot now be heard to claim that they are not

bound by their contractual disclaimers as against Defendants." (*Id.* at 3). Defendants prevailed in persuading the state court that they are not bound by the arbitration provision of the PSAs; they consequently fail to persuade this Court that they enjoy the benefits of disclaimers found in those very same Agreements to show Plaintiffs fail to state claims for relief under the FDUTPA.

Because Defendants are not parties to the PSAs, and because they have disavowed any connection to those Agreements, they may not enjoy the benefit of the disclaimers contained therein to defeat FDUTPA claims on a Rule 12(b)(6) motion to dismiss.[4]

### 2. Plaintiffs Sufficiently Pled Defendants' Involvement in the Unfair and Deceptive Trade Practices

Defendants next argue that Plaintiffs have not sufficiently pled Defendants' involvement in any unfair or deceptive trade practices. According to Defendants

> [t]he only conduct Plaintiffs specifically allege against IMGA is that IMGA discussed its involvement in the Orlando Cay Clubs Resort on its website (Compl. ¶ 205), urged buyers to use a particular real estate agent if they wished to resell the property in the future (Compl. ¶ 206), and conducted tours of its current facilities. (Compl. ¶ 207). Likewise, the only conduct Plaintiffs specifically allege against Sunvest is that in a newsletter, which Plaintiffs fail to specifically identify by publishing date, and otherwise failed to attach to the Complaint, Sunvest represented it was a developer of the Project. (Comp. ¶ 200).

(*Mot. Dismiss* at 10–11). Such allegations, Defendants claim, are insufficient to state a claim under the FDUTPA.

■ To state a claim under the FDUTPA, one need not show the defendant was the principal actor involved in the violative acts, or that the defendant initiated those acts. *See Sundance Apartments I, Inc. v. General Elec. Capital Corp.*, 581 F.Supp.2d 1215, 1222 (S.D.Fla. 2008) (it is sufficient to allege that a party directly participated in a violation of the FDUTPA, even if that violation was initiated by another); *K.C. Leisure, Inc. v. Haber*, 972 So.2d 1069, 1073–74 (Fla. 5th DCA 2008) (FDUTPA liability extends beyond the corporate seller to others who participated in the deceptive acts). What one must allege to state a claim under the FDUTPA is (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).

■ In their Complaint, Plaintiffs make several specific allegations against IMG and Sunvest to demonstrate Defendants' participation in the FDUTPA violations. Plaintiffs allege IMG posted statements on its website stating Cay Clubs is IMG's "in-house real estate development partner," and provided links to the Orlando Cay Clubs' website (*see Compl.* at ¶ 205); IMG promoted the project through its real estate sales office, stating "[a]n Academy Realty sales agent will provide the utmost professional expertise in not only advertising your unit in the marketing mediums our corporate office has deemed most effective, but, more importantly, in receiving top dollar for the value of your unit within the Orlando Cay Club Resort and Academy" (*id.* at ¶ 206); and IMG conducted tours of its Bradenton facility to prospective buyers of units in the Orlando Cay Club Academy, and explained it was involved in the Orlando Cay Clubs development. (*See id.* at ¶ 207). These allegations are more than sufficient to demonstrate IMG's involvement with and participation in the development scheme.

■ As to Sunvest, Plaintiffs allege that in a newsletter published and distributed by Sunvest, it discussed its strategic alliance with Cay Clubs and IMG in the Or-

---

**4.** Although not necessary to a determination of this argument for dismissal, Plaintiffs also point out that the representations made by IMG and Sunvest regarding a purported development partnership with Cay Clubs are nowhere contradicted in the PSAs, and therefore Plaintiffs' reliance on the prior representations was reasonable.

lando Cay Club Resort and Academy, and represented it was the developer or co-developer of the project. (*See id.* at ¶ 220). Plaintiffs further allege Sunvest purchased the Eaglewood Apartments and sold them to DC720JV, LLC shortly before Plaintiffs closed on each unit, and it directly participated in the marketing and sale of the units through its real estate brokers and agents. (*See id.* at ¶ 222). Once again, these allegations are sufficient to demonstrate Sunvest was an active participant in the project.

Plaintiffs have sufficiently alleged Defendants' participation in the development project and specific representations made by each Defendant to establish FDUTPA liability against Defendants.

3. *Plaintiffs Have Standing to Seek Declaratory Relief under the FDUTPA*

■ Defendants assert Plaintiffs lack standing to seek declaratory relief under the FDUTPA, arguing "[t]o obtain declaratory or injunctive relief, a plaintiff must demonstrate that there was a violation of the law, that there is a serious risk of continuing irreparable injury if the relief sought is not granted, and the absence of an adequate remedy at law." (*Mot. Dismiss* at 11). Defendants claim because Plaintiffs have not alleged an ongoing violation, they lack standing for injunctive or declaratory relief. (*See id.*). Defendants are confusing the requirements for injunctive or declaratory relief under federal statutes with the quite different requirements under the FDUTPA.[5]

■ Section 501.211, Florida Statutes, states as follows:

Other individual remedies.—

(1) Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

As the Florida First District Court of Appeal has explained, "[s]ection 501.211(1), Florida Statutes[,] is broadly worded to authorize declaratory and injunctive relief even if those remedies might not benefit the individual consumers who filed the suit." *Davis v. Powertel, Inc.*, 776 So.2d 971, 975 (Fla. 1st DCA 2000). The FDUTPA "is designed to protect not only the rights of litigants, but also the rights of the consuming public at large." *Id.*; *see also Hialeah Automotive, LLC v. Basulto*, No. 3D07–855, —— So.3d ——, 2009 WL 187584 (Fla. 3d DCA 2009) (finding declaratory relief an available remedy under Fla. Stat. § 501.211(1)); *Schauer v. Morse Operations, Inc.*, 5 So.3d 2, 7 (Fla. 4th DCA 2009) ("[S]ection 501.211 provides that a person aggrieved by a violation of FDUTPA may obtain a declaratory judgment that an act or practice violates FDUTPA.").

The statute is clear on its face. Any person aggrieved by a violation of the FDUTPA may seek declaratory and/or injunctive relief under the statute. There is no requirement that a plaintiff show an ongoing practice or irreparable harm, and declaratory relief is available regardless of whether an adequate remedy at law also exists. Because Plaintiffs have stated a claim of a violation of the FDUTPA, they

---

**5.** As Plaintiffs point out, all the cases cited by Defendants in support of this argument deal with plaintiffs bringing suit in federal district courts for injunctive and/or declaratory relief under federal statutes. In this case, Plaintiffs brought their claim for declaratory relief in state court under the FDUTPA, a state statute. The removal of the case to federal court by Defendants did not transform Plaintiffs' claim into a claim for declaratory relief under a federal statute.

are entitled to seek a declaratory judgment on that claim.

■■■ Plaintiffs also satisfy the requirements for threshold standing under Article III. " '[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.' " *Bochese v. Town of Ponce Inlet,* 405 F.3d 964, 974 (11th Cir.2005) (quoting *Dillard v. Baldwin County Comm'rs,* 225 F.3d 1271, 1275 (11th Cir.2000)). "To have standing, a plaintiff must establish (1) an injury in fact, which is concrete and particularized and actual or imminent; (2) a causal connection between the injury and the causal conduct; and (3) a substantial likelihood that a favorable decision will redress the injury." *Amnesty Intern., USA v. Battle,* 559 F.3d 1170, 1177 (11th Cir.2009) (citing *Granite State Outdoor Adver. v. City of Clearwater, Fla.,* 351 F.3d 1112, 1116 (11th Cir.2003)).

■■■ Plaintiffs have established the requisite elements for Article III standing. Plaintiffs allege a clear injury in fact: the loss of over $70 million. Plaintiffs have also demonstrated the causal connection between the Defendants' misrepresentations and Plaintiffs' loss. Finally, Plaintiffs maintain that if the Court enters a declaratory judgment that Defendants' conduct violates the FDUTPA, Plaintiffs will be able to seek redress for their losses.

4. *Plaintiffs' FDUTPA Claims Are Pled with Sufficient Particularity*

■■■ Defendants argue Plaintiffs' FDUTPA claims are not pled with sufficient particularity to satisfy Fed.R.Civ.P. 9(b). The requirements of Rule 9(b) do not apply to claims under the FDUTPA. "FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud, and therefore, 'the plaintiff need not prove the

elements of fraud to sustain an action under the statute.' " *Florida v. Tenet Healthcare Corp.,* 420 F.Supp.2d 1288, 1310 (S.D.Fla.2005) (quoting *Davis,* 776 So.2d at 974). Because Rule 9(b) does not apply to FDUTPA claims, its requirements cannot serve as a basis to dismiss those claims.

## B. Fraudulent Inducement

Defendants contend Count Four, alleging fraudulent inducement, fails for two reasons: (1) the disclaimers in the contracts bar the claim; and (2) the claim is not pled with sufficient particularity to satisfy Fed.R.Civ.P. 9(b).

1. *The Written Contracts Do Not Bar Plaintiffs' Fraudulent Inducement Claim*

As is the case with the FDUTPA claims, because Defendants are not parties to the contracts, they may not benefit from its disclaimers. The PSAs therefore do not affect the viability of Plaintiffs' claim of fraudulent inducement.

2. *The Fraudulent Inducement Claim Is Pled with Sufficient Particularity*

Rule 9(b), Fed.R.Civ.P., provides: "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Defendants argue Plaintiffs' claim of fraudulent inducement is not pled with sufficient particularity to satisfy Rule 9(b). Interpreting Rule 9(b), the Eleventh Circuit has explained:

"The particularity rule serves an important purpose in fraud actions by alerting defendants to the 'precise misconduct with which they are charged' and protecting defendants 'against spurious charges of immoral and fraudulent behavior.' " *Durham v. Bus. Management Assocs.,* 847 F.2d 1505, 1511 (11th Cir.

1988) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir.1984)). The application of Rule 9(b), however, "must not abrogate the concept of notice pleading." *Id.* Rule 9(b) is satisfied if the complaint sets forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir.2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir.1997)).

 As summarized above, Plaintiffs have made many specific allegations of fraud, including exactly what misleading statements were made, when and where they were made, and in several instances, by whom they were made. "Plaintiffs are not expected to specify the exact time and the particular place of each factual omission or misrepresentation, but they must provide a sufficiently narrow time frame from which defendants could derive notice as to when the misrepresentations were made." *Flamenbaum v. Orient Lines, Inc.*, No. 03–22549–CIV, 2004 WL 1773207, at *6 (S.D.Fla. July 20, 2004). Plaintiffs' allegations of fraud are sufficient to put Defendants on notice as to the precise misconduct with which they are charged, and therefore satisfy Rule 9(b).

Defendants further argue that Plaintiffs lump Defendants together in an impermissible fashion. (*See Mot. Dismiss* at 12). A review of the Complaint shows just the opposite. Plaintiffs clearly delineate which statements are attributed to Cay Clubs and its agents, which are attributed to IMG and its agents, and which to Sunvest and its agents. Finally, Defendants argue that Plaintiffs fail to identify which specific Plaintiffs heard or read which misleading statements. This argument does not address Rule 9(b) issues; rather, Defendants here are arguing reliance, which goes to the merits of the claim rather than any pleading deficiency.

In sum, Plaintiffs have sufficiently pled their fraudulent inducement claim to satisfy Rule 9(b), and dismissal is not warranted.

## C. Conversion and Civil Theft

### 1. *Plaintiffs State a Claim for Conversion*

Defendants argue Plaintiffs' claims for conversion and civil theft in Count Five must be dismissed. They maintain that because the property alleged to have been converted is money, which is fungible, the money must be specifically identifiable or the claim fails. (*See Mot. Dismiss* at 14). Defendants cite cases from Florida courts and explain that Florida recognizes conversion claims for money only in limited circumstances in which, for instance, a bailor improperly delivered an envelope full of money, or a bank failed to deposit a bag of money into the proper account. (*See id.*). Defendants cite to *Fla. Desk, Inc. v. Mitchell Intern., Inc.*, 817 So.2d 1059 (Fla. 5th DCA 2002), and *Belford Trucking Co. v. Zagar*, 243 So.2d 646 (Fla. 4th DCA 1970).

 The circumstances under which Florida courts recognize conversion claims of money are not quite as limited as Defendants suggest. While bailment scenarios may constitute the majority of money conversion cases, conversion of money may also exist when a party pays money to another for a specific purpose, as long as the money is "delivered at one time, by

one act and in one mass." *Joseph v. Chanin,* 940 So.2d 483 (Fla. 4th DCA 2006). Several courts, applying Florida law on conversion, have found a claim for conversion may lie when a party takes money from another, as long as the money is sufficiently identifiable. *See, e.g., Rosenthal Toyota, Inc. v. Thorpe,* 824 F.2d 897, 902 (11th Cir.1987) (conversion was committed when defendant took plaintiff's money with no intention of delivering cars); *Florida Dept. Ins. v. Debenture Guar.,* 921 F.Supp. 750, 757 (M.D.Fla. 1996) (where $1.1 million was not placed into the proper account, the court found the money sufficiently identifiable for a conversion claim to survive a motion to dismiss); *Masvidal v. Ochoa,* 505 So.2d 555 (Fla. 5th DCA 1987) (defendant who took funds from plaintiff's escrow committed conversion).

■ In this case, Plaintiffs claim Defendants took their money, which was delivered by each Plaintiff at one time, by one act, and in one mass when each Plaintiff closed on a particular unit at Eaglewood Apartments. Plaintiffs allege that when Defendants took their money, they had no intention of delivering the promised consideration in exchange for the funds, namely, the transformation of the apartment complex into a luxury resort.

Defendants argue the facts of this case are distinguishable from the cases relied on by Plaintiffs. They first argue that several of the cases cited by Plaintiffs involve the payment of monies which were to be held in specific, discrete accounts, whereas here, Plaintiffs' payments were not required to be held in discrete accounts. (*See Reply* at 15). Although this factual distinction exists, the holdings of these cases were not based on the discrete account factor, but on the "at one time, by one act, in one mass" factor, which is satisfied in this case.

Defendants also attempt to distinguish *Rosenthal Toyota, Inc.,* 824 F.2d 897. In *Rosenthal,* the plaintiff car dealer paid the Toyota distributor for the delivery of several vehicles. *Id.* at 899. The distributor deposited the dealer's check, but never delivered the cars. *Id.* The car dealer provided evidence to show the distributor did not intend to deliver the cars when it cashed the car dealer's checks. *Id.* at 900. The car dealer filed suit against the distributor alleging conversion and civil theft, among other counts, and the Eleventh Circuit affirmed a jury verdict in favor of the plaintiff on all counts. *Id.* at 906.

Defendants argue the facts of this case differ from *Rosenthal* because in *Rosenthal,* when the plaintiff delivered the funds, the specific property he was to receive was given to another person. In this case, Defendants maintain, "at the time Plaintiffs delivered their funds to DC720JV, LLC, they received from DC720JV, LLC exactly what they paid for under the contract: an 'as is' condominium unit." (*Reply* at 16).

Plaintiffs dispute they paid for "as is" condominium units. They further dispute that the terms of the Purchase and Sale Agreements were clear as to the "as is" condition of the units. Notably, the PSAs contain language related to construction completion dates and permitting, including deadlines for the seller to complete construction on the units. (*See* PSA at ¶¶ 5, 9). Those paragraphs clearly contemplate improvements being made by the seller.

Plaintiffs allege that when they paid the full purchase price of the converted, luxury condominium units to DC720JV, LLC, they did so based upon representations made by Defendants. They further allege that at the times of payment, Defendants had no intention of performing any of the improvements represented to Plaintiffs. According to Plaintiffs, Defendants simply

took their money with no intention of providing the promised consideration. Plaintiffs' allegations satisfy the elements for a claim of conversion under Florida law.

### 2. *Plaintiffs State a Claim for Civil Theft*

▪ Defendants argue that if Plaintiffs' conversion claim fails, the civil theft claim must also fail. Defendants further argue Plaintiffs' civil theft claim must fail because Plaintiffs do not allege criminal intent. Under Florida law, "[t]o establish a claim for civil theft, a party must prove that a conversion has taken place and that the accused party acted with criminal intent." *Gasparini v. Pordomingo*, 972 So.2d 1053, 1056 (Fla. 3d DCA 2008).

▪ Because Plaintiffs have successfully pled a claim for conversion, they need only allege criminal intent for the civil theft claim to survive. Plaintiffs need not *prove* criminal intent at this juncture; they need only plead it, which they have. Plaintiffs allege Defendants acted "knowingly and with the intent to permanently deprive each Plaintiff of their property, and appropriate it to their own use or the use and benefit of others not entitled to it." (*Compl.* at ¶ 284). Plaintiffs have stated a claim for civil theft sufficient to survive a motion to dismiss.

### D. Purported Partnership

Plaintiffs seek to hold Defendants liable not only for their own conduct, but for the conduct of Cay Clubs as well, based on a purported partnership theory. Defendants argue Plaintiffs' theory fails and no liability can attach to Defendants for any acts of Cay Clubs.

Florida Statute Section 620.8308 provides:

> If a person, by words or conduct, purports to be a partner, or consents to being represented by another as a partner, in a partnership or with one or more persons who are not partners, the purported partner is liable to a person to whom the representation is made if such person, relying on the representation, enters into a transaction with the actual or purported partnership. If the representation, either by the purported partner or by a person with the purported partner's consent, is made in a public manner, the purported partner is liable to a person who relies upon the purported partnership even if the purported partner is not aware of being held out as a partner to the claimant . . . .

Consistent with the statute, Plaintiffs' Complaint alleges a purported partnership existed between Defendants and Cay Clubs such that liability will attach to Defendants for Cay Clubs' actions.

Nevertheless, Defendants argue that under Florida law, purported partnership liability attaches only when a plaintiff has extended credit to a purported partnership, or has entered into a contractual relationship with the purported partner. Liability will not attach, according to Defendants, for tort actions. Defendants begin their argument in support of this position relying on Florida Statute Section 620.635, the predecessor to Section 620.8308. Section 620.635 did, indeed, limit purported partnership liability to cases in which the plaintiff had extended credit on the faith of the partnership representation. However, Section 620.635 was replaced by Section 620.8308, and no such limitation exists in the current statute.

Defendants also attempt to bolster their claim that purported partnership liability does not extend to tort claims by citing cases from other states. Their argument fails to persuade. First, Defendants have cited no Florida case containing any limitation on purported partnership liability. The statute on its face contains no limiting language; absent a case holding otherwise,

a logical reading of the statute must find that no limitation exists. Moreover, only one of the four cases cited by Defendants actually stands for the proposition that purported partnership liability does not extend to tort actions; the other holdings address reliance issues.[6]

Finally, Plaintiffs cite numerous cases in which purported partnership liability has been found to apply to tort claims. *See, e.g., Irwin Seating Co. v. IBM,* No. 1:04–CV–568, 2007 WL 2351007, at *11 (W.D.Mich. Aug. 15, 2007); *Glazer v. Brookhouse,* 471 F.Supp.2d 945, 948–50 (E.D.Wis.2007); *American Cas. Co. v. Costello,* 174 Mich.App. 1, 435 N.W.2d 760, 762–63 (1989); *Baranowski v. Strating,* 72 Mich.App. 548, 250 N.W.2d 744, 749 n. 4 (1976); *Frye v. Anderson,* 248 Minn. 478, 80 N.W.2d 593, 603 (1957); *Cook v. Coleman,* 90 W.Va. 748, 111 S.E. 750, 752 (1922). While there is no reported Florida case on point, the abundance of cases applying purported partnership liability to tort claims is persuasive. Given the language of the statute following its amendment, there is no indication that Florida courts would find purported partnership liability does not apply to tort claims.[7]

■■■ Defendants finally argue Plaintiffs have not adequately pled they relied to their detriment on the existence of a partnership between Cay Clubs and Defendants, and even if they did, that reliance is unreasonable as a matter of law. A review of the Complaint makes clear Plaintiffs

have pled reliance. Plaintiffs repeatedly allege they relied on the representations that Cay Clubs was partnered with Defendants in the development project. For example, Plaintiffs make the following allegations:

> Plaintiffs each were induced to purchase a unit at the Eaglewood Apartments on representations that IMGA was a partner in the Orlando Cay Clubs Resort and Academy project, the units would be converted into luxury condominium units, the property developed into a five-star resort and IMGA sports complex and training facility, and IMGA would manage the project post-development.

(*Compl.* at ¶ 189).

> Plaintiffs, in paying in full for and closing on units prior to conversion, justifiably and in good faith relied on the representations by IMGA and its purported partner Cay Clubs that IMGA was invested in the project as a partner, the units would be converted into high-end luxury condominium units, the property developed into a five-star resort and IMGA sports complex and training facility, and IMGA's participation in the project would continue post-development.

(*Id.* at ¶ 212).

> Like IMGA, Sunvest's participation with the project and purported partnership relationship was critical to the credibility of the project as shown by statements

---

**6.** Defendants cite *Pruitt v. Fetty,* 148 W.Va. 275, 134 S.E.2d 713 (1964); *Roethke v. Sanger,* 68 S.W.3d 352 (Ky.2001); *Rowland v. Canuso,* 329 Pa. 72, 196 A. 823 (Pa.1938); and *Bertin Steel Processing, Inc. v. U.S. Steel Corp.,* No. 1:02–CV–1669, 2005 WL 2205332 (N.D.Ohio 2005). Only *Bertin Steel* actually supports Defendants' position. While the courts in the other cases did not find purported partnership liability to apply, no court held it was because the claim in question sounded in tort rather than contract.

**7.** In the absence of a decision from the Florida Supreme Court or any Florida appellate courts, a district court must try to determine how the Florida Supreme Court would rule on the issue. To do that, a district court may consider case law from other jurisdictions that have considered similar issues. *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.,* 420 F.3d 1317, 1326 (11th Cir. 2005).

made by Cay Clubs to the Orange County Board of Commissions that IMGA, Sunvest and Cay Clubs are partners in the project. And, to prospective buyers, Sunvest's participation was touted as assurance that the project would be developed and successful....

(*Id.* at ¶ 219).

Plaintiffs in purchasing and closing on a unit and tendering full price for a unit prior to conversion, each justifiably and in good faith relied on Sunvest's and Cay Clubs' representations that Sunvest was a partner and would participate in the Orlando Cay Clubs Resort and Academy project, the units would be converted into high-end luxury condominium units, the property developed into a five-star resort and IMGA sports complex and training facility, and IMGA would manage the project post-development.

(*Id.* at ¶ 227). These allegations demonstrate actual reliance by Plaintiffs on the partnership between Defendants and Cay Clubs. No pleading deficiency exists to warrant dismissal.

As to whether Plaintiffs' reliance was unreasonable as a matter of law, Defendants point to the disclaimer language in the PSAs signed by each Plaintiff. Again, Defendants are precluded from benefitting from language within a contract they are not parties to and have disavowed to obtain a Rule 12(b)(6) dismissal. Moreover, even if they could invoke the disclaimers, the contract language does not render Plaintiffs' reliance unreasonable as a matter of law.

Admittedly, several courts applying Florida law have found that fraudulent misrepresentation claims and FDUTPA claims are barred by disclaimer clauses because those clauses rendered the plaintiffs' reliance unreasonable as a matter of law. *See, e.g., Garcia,* 528 F.Supp.2d at 1295; *Zlotnick,* 431 F.Supp.2d at 1295;

*Rosa v. Amoco Oil Co.,* 262 F.Supp.2d 1364, 1368 (S.D.Fla.2003). The same reasonableness requirement exists for purported partnership claims. *See, e.g., U.S. for Use and Benefit of Krupp Steel Prods., Inc. v. Aetna Ins. Co.,* 923 F.2d 1521 (11th Cir.1991) (noting the doctrine of equitable estoppel generally requires reasonable reliance). That requirement notwithstanding, disclaimer clauses will not bar fraud claims unless those clauses expressly and specifically address and contradict the misrepresentations on which the claims are based. *Indulgence Yacht Charters, Ltd. v. Ardell Inc.,* No. 08–60739, 2008 WL 4346749, at *7 (S.D.Fla. Sept. 16, 2008).

In this case, Plaintiffs claim Defendants held themselves out as partners with Cay Clubs and allowed Cay Clubs to represent that Defendants were its partners. Plaintiffs allege they relied on this representation to their detriment, believing the partnership would develop the property into a luxury resort and sports training facility. Nothing in the Purchase and Sale Agreements contradicts any prior oral or written statements regarding the purported partnership between Cay Clubs and Defendants. There is no provision in the Agreements that Cay Clubs will not partner with IMG or Sunvest; there is no provision that a sports training complex will not be built; nor is there a provision that the property will not be converted to a five-star resort. The language of the PSAs does not render Plaintiffs' reliance on the purported partnership unreasonable as a matter of law so as to warrant a dismissal of the Complaint for the failure to state a claim. Plaintiffs' theory of liability against Defendants for the actions of Cay Clubs does not fail under Florida partnership law.

**IV. CONCLUSION**

In accordance with the foregoing, it is **ORDERED AND ADJUDGED** that De-

fendants' Motion to Dismiss [D.E. 12] is
**DENIED.**